**US WEST COMMUNICATIONS, INC.,
a Colorado corporation, Plaintiff,**

v.

**Robert J. HIX, et al., Defendants.**

**Civ.A.Nos. 97–D–152, 97–D–387, 97–
D–934, 97–D–1667, 97–D–2047,
97–D–2096 and 98–D–934.**

United States District Court,
D. Colorado.

April 13, 2000.

William M. Ojile, Jr., Colleen M. Rea, Evergreen, CO, Bobbee J. Musgrave, B. Lawrence Theis, Perkins Coie, Denver, CO, Kathryn E. Ford, Steven Harold Denman, Richard L. Corbetta, Melissa A. O'Leary, Denman & Corbetta PC, Denver, CO, Russell Paul Rowe, Michael Craig Thompson, Denver, CO, for U.S. West Communications, Inc., a Colorado corporation, plaintiff.

Linda Ann Surbaugh, United States Attorney's Office, Civil Division, Denver, CO, Theodore C. Hirt, U.S. Department of Justice, Civil Division, Washington, DC, Martha Hirschfield, for USA, F.C.C., intervenor-plaintiffs.

David Alexander Beckett, Attorney General's Office, Department of Law, Denver, CO, Anthony Marquez, Attorney General's Office, Human Resources Section, Denver, CO, for Robert J. Hix, Commissioner of the Public Utilities Commission of the State of Colorado, Brent Alderfer, Vincent Majkowski, defendants.

Joseph W. Halpern, Robert M. Pomeroy, Jr., Marcy Geoffrey Glenn, Holland & Hart, LLP, United States District Court, Denver, CO, Michael D. Warden, Sidley & Austin, Washington, DC, Paul Michael Gordon, Wendell Hume Goddard, Gordon & Goddard LLP, Oakland, CA, David R. DeMuro, Vaughan & DeMuro, Denver, CO, Deborah S. Waldbaum, Deborah Waldbaum, Atty at Law, Englewood, CO, for TCG Colorado, a New York General Partnership, Teleport Communications Group, Inc., defendants.

Craig D. Joyce, Anne Baudino Holton, Walters & Joyce, P.C., Denver, CO, Albert H. Kramer, David Blair Killalea, Dickstein, Shapiro, Morin & Oshinsky, Washington, DC, for ICG Telecom Group, Inc., a Colorado corporation, defendant.

Robert W. Nichols, Phillisa Scott Shoemaker, Nichols & Hecht, LLC, Denver, CO, Charles B. Hecht, Petrie, Bauer, Vriesman & Hecht, Denver, CO, for McImetro Access Transmission Services, Inc., intervenor-defendant.

Letty S.D. Friesen, Ireland, Stapleton, Pryor & Pascoe, P.C., United States District Court, Denver, CO, Joseph W. Halpern, Robert M. Pomeroy, Jr., Marcy Geoffrey Glenn, Dorsey & Whitney, Denver, CO, for AT & T of the Mountain States, Inc., intervenor-defendant.

Theodore C. Hirt, U.S. Department of Justice, Civil Division, Washington, DC, Martha Hirschfield, for Federal Communications Commission, amicus.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL, District Judge.

THIS MATTER arises under Sections 251 and 252 of the Telecommunications Act

of 1996, 47 U.S.C. §§ 251 and 252 ("the Telco Act"). The Telco Act fundamentally restructured local telephone markets, ending the monopolies that States historically granted to local exchange carriers (LECs) and subjected incumbent LECs to an array of duties intended to facilitate market entry, including the obligation under 47 U.S.C. § 251(c) to share their market with competitors.

Under the Telco Act, U.S. West Communications, Inc. ("USWC"), the incumbent local exchange carrier ("ILEC"), brings suit against certain competitive local exchange carriers ("CLECs") challenging provisions of interconnection agreements approved by the Colorado Public Utilities Commission ("CPUC" or "the Commission") pursuant to the Telco Act. The CLECs have asserted a number of counterclaims also challenging provisions of the interconnection agreements.

A hearing was held on September 22, 1998, in connection with certain issues concerning the merits of this case. The Court, being fully advised in the premises, hereby issues its Findings of Fact and Conclusions of Law in regard to sham unbundling and directory listing requirements.

## I. USWC's SHAM UNBUNDLING CLAIM

### A. Findings of Fact

1. USWC challenges provisions in each of its separate interconnection agreements ("Agreements") with AT & T, MCI, ICG, WorldCom,[1] and Sprint, all of whom are CLECs, claiming that those provisions permit the new entrants to engage in what USWC characterizes as "sham unbundling".[2] This challenge is, in fact, two separate claims. The CLECs contend that only one of the two claims was raised during the arbitration before the CPUC.[3]

2. First, USWC asserts that the Telco Act prohibits new entrants from obtaining unbundled network elements ("UNEs") at cost-based rates and using those elements to provide finished telecommunications services (the "sham unbundling" claim). *See* USWC Communications, Inc.'s Brief on the Merits ("USWC Br. at 4"). USWC argues in this regard that this so called sham unbundling would obliterate the distinction between resale of discounted retail prices and purchase of UNEs at cost as set forth in the Telco Act at 47 U.S.C. § 251(c)(3) and (4). USWC also contends that sham unbundling allows CLECs to evade the restriction on joint marketing of resold services with long-distance service under Section 271(e)(1) of the Telco Act. Second, in the claim that the CLECs contend was not raised in the arbitration, USWC argues that the Agreements violate the Act by requiring USWC either to provide already-combined network elements to new entrants or to rebundle network elements into combinations (the "duty to combine" claim). *Id.*[4]

---

1. WorldCom was substituted for MFS Communications Company, Inc. and MFS Intelenet, Inc. in both the interconnection agreement and this litigation.

2. USWC's claim with respect to TCG's Interconnection Agreement was dismissed pursuant to a stipulation between the parties.

3. The Commission consolidated for hearing the arbitration proceedings between USWC and AT & T (Docket No. 96A–345T), MCI (Docket No. 96A–366T), TCG (Docket No. 96A–329T), ICG (Docket No. 96A–356T), and MFS (Docket No. 96A–287T). *See In Re: Interconnection Contract Negotiations Between AT & T and U.S. West,* Docket No. 96A–345T,

Decision No. C96–1231, Decision Regarding Petition for Arbitration, at 7 (CPUC Nov. 27, 1996) (J.A. Vol. 10, Tab 93, at 10309) ("AT & T Arbitration Decision"). The USWC–Sprint arbitration was not consolidated with these other hearings.

4. The Court notes that the parties were ordered to provide revised findings of fact and conclusions of law in connection with the issues taken under advisement at the first and second hearing. Neither party submitted revised findings of fact and conclusions of law on the sham unbundling claim. The CLECs' submission in footnote one explains that the parties omitted the findings and conclusions on this issue from their recent filing pending

3. With respect to USWC's sham unbundling claim, each of the Agreements permits the new entrant in the local telephone market to use elements of USWC's network obtained at cost-based rates to provide finished telecommunications services to local telephone customers without any requirement that the new entrant own or use its own facilities. *See, e.g.,* USWC–AT & T Interconnection Agreement, Att. 3 (Joint Appendix ("J.A.") Vol. 13, Tab 126, at 25052).[5]

4. USWC argued before the CPUC that, under the Act, a new entrant could not provide finished telecommunications services using only cost-based elements from USWC's network without utilizing its own facilities. USWC claimed that the new entrants wishing to offer finished services solely through unbundled network elements must pay wholesale rates applicable to the resale of telecommunications services under §§ 251(c)(4) and 252(d)(3) of the Act, rather than the cost-based rates for network elements under §§ 251(c)(2) and 252(d)(1). The CPUC succinctly described USWC's position before it:

> For its part, USWC recommends that the Commission restrict AT & T's ability to buy unbundled elements such that reassembly of those unbundled elements to create a complete telecommunications service is not possible. USWC witnesses testified that they disagree with the [*FCC Local Competition Order*] and are of the opinion that the purchase of all of the necessary unbundled elements to form a complete service is not within the intent of the 1996 Telecommunications Act. Specifically, Dr. Harris, a USWC witness, testified that the poten-

tial for price arbitrage created by this situation would harm USWC.

AT & T Arbitration Decision, at 66–67 (J.A.Vol. 10, Tab 93, at 10368–69); Decision Regarding MCI's Petition for Arbitration (J.A.Vol. 10, Tab 103, at 11550–551).

5. During the consolidated arbitration hearing, USWC urged the CPUC not to follow provisions of the FCC's *Local Competition Order* that permit new entrants to replicate a finished service using network elements, describing the FCC's rules as permitting "phantom" or "sham" unbundling. Testimony ("Test.") of Brian Johnson, at 52–53 (J.A.Vol. 1, Tab 6, at 893–94). USWC argued to the CPUC that its competitors would be able to engage in "pricing arbitrage" if they could lease combinations at cost-based rates, and USWC's witness testified that the issue was "principally a pricing issue." USWC's Closing Statement, at 17 (J.A.Vol. 1, Tab 15, at 4471); 9/30/96 Hearing Transcript ("Tr."), at 252 (J.A.Vol. 9, Tab 71); *see* Test. of Robert G. Harris, at 33 (J.A.Vol. 1, Tab 4, at 570) ("[s]ham unbundling is nothing more—and nothing less—than pure price arbitrage, by which new entrants can circumvent the avoided cost standard for the resale of bundled services").

6. The CPUC rejected USWC's sham unbundling claim, holding that the Agreements should "not include any restrictions on the bundling of network elements apart from any incorporated through the Interconnection Tariff." *See, e.g.,* AT & T Arbitration Decision, at 68 (J.A.Vol. 10, Tab 93, at 10370).

7. The second unbundling claim raised by USWC challenges provisions in each of the Agreements that require USWC to provide combinations of network elements

---

further argument on the combinations issue. The Court addresses sham unbundling herein, however, because it believes that this issue is unrelated to the combinations argument at issue in the pricing docket. Moreover, the Court has addressed the merits of the issue of whether USWC can be ordered to provide already existing UNEs to the CLECs, even

though USWC filed a notice of withdrawal of that claim on April 5, 2000, because the Court had reached a decision on this issue prior to USWC's attempted withdrawal of that claim.

**5.** The USWC–MCI Agreement is identical to the USWC–AT & T Agreement.

to new entrants. Because most of the agreements between USWC and new entrants differ, I review the specific provisions of each agreement.

8. *The AT & T/MCI Agreements.* USWC challenges provisions in the AT & T/MCI Agreements that require it to "offer each Network Element individually and in combination with any other Network Element or Network Elements in order to permit AT & T to provide Telecommunications Services to its subscribers." USWC–AT & T Agr., Attachment ("Att.") 3, § 2.3–2.5 (J.A.Vol. 13, Tab 126, at 25053); USWC–MCI Agr., Att. 3, § 2.4 (*id.*, Tab 128, at 26200). The AT & T/MCI Agreements define "combinations" as the "provision by USWC of two or more currently connected Network Elements ordered by [AT & T/MCI] to provide its Telecommunications Services in a geographic area or to a specific subscriber." USWC–AT & T Agreement ("Agr."), part B (*id.* at 25027); USWC–MCI Agr., part B (J.A.Vol. 13, Tab 128, at 26174). The CLECs assert that because of this limiting definition, USWC contends that it should be permitted to dismantle existing combinations of network elements.

9. *The WorldCom Agreement.* USWC challenges the combination provision in Section XXXI.A.3 of the WorldCom–USWC Interconnection Agreement. That section provides:

> USWC will not restrict the types of telecommunications services MFS may offer through unbundled network elements, nor will it restrict MFS from combining elements with any technically compatible equipment that MFS owns. USWC will provide MFS with all of the functionalities of a particular element, so that MFS can provide any telecommunications services that can be offered by means of the element. USWC agrees to perform and MFS agrees to pay for the functions necessary to combine requested elements in any technically feasible manner either with other elements from USWC's network, or with elements possessed by MFS. However, USWC need not combine network elements in any manner requested if not technically feasible, but must combine elements ordinarily combined in its network in the manner they are typically combined.

J.A.Vol. XII, Tab 120, at 5862.

10. *The ICG Agreement.* USWC challenges Section XXXI.A.2 of the ICG–USWC Interconnection Agreement, which reads as follows:

> USWC will not restrict the types of telecommunications services ICG may offer through unbundled elements, nor will it restrict ICG from combining elements with any technically compatible equipment the [sic] ICG owns. USWC will provide ICG with all of the functionalities of a particular element, so that ICG can provide any telecommunications services that can be offered by means of the element. USWC agrees to perform and ICG agrees to pay for the functions necessary to combine requested elements in any technically feasible manner either with other elements from USWC's network, or with elements possessed by ICG. However, USWC need not combine network elements in any manner requested if not technically feasible, but must combine elements ordinarily combined in its network in the manner they are typically combined.

J.A. Vol. 12, Tab 125, at 7397.

11. *The Sprint Agreement.* Finally, USWC challenges Section 32.1.2 of the arbitrated Interconnection Agreement between Sprint and USWC, which reads as follows:

> USWC will not restrict the types of telecommunications services Sprint may offer through unbundled elements, nor will it restrict Sprint from combining elements with any technically compatible equipment that USWC or Sprints owns or for which Sprint arranges. USWC will provide Sprint with all of the functionalities of a particular element, so that Sprint can provide any telecommu-

nications services that can be offered by means of the element. USWC agrees to perform and Sprint agrees to pay for the TELRIC costs of the functions necessary to combine requested elements in any technically feasible manner either with other elements from USWC's network, or with elements possessed or arranged for by Sprint. However, USWC need not combine network elements in any manner requested if not technically feasible, but must combine elements ordinarily combined in its network in the manner they are typically combined.

J.A. Vol. 11, Tab 112, at 1673.

12. With respect to the consolidated arbitration proceedings, the CLECs contend that the issue of whether USWC should be required to combine UNEs was resolved through negotiation and was never identified as an open issue. Similarly, the CLECs assert that the issue of whether USWC should be required to combine and/or permitted to dismantle existing combinations of network elements when it provided those network elements was not raised at any point during the arbitration proceedings, and was not submitted to the Commission for arbitration by any of the parties. Instead, it is contended that USWC's sole focus during the arbitration hearing was whether the cost-based pricing standard of § 252(d)(1) or wholesale prices pursuant to § 252(d)(3) applied to the use of unbundled networks to provide finished services, *i.e.*, the sham unbundling claim. *See* Closing Statement of Position of USWC, at 18–19 (J.A. Vol. 1, Tab 15, at 4472–73); Test. of Robert G. Harris, at 32–37 (J.A. Vol. 1, Tab 4, at 569–74).

13. As to whether the issue of USWC's duty to combine was resolved through negotiation, the only combination requirement that USWC contends was not negotiated or agreed to was in the MFS Interconnection Agreement (now World-Com). I find as to the MFS/WorldCom agreement that USWC has not demonstrated that the combination provision was actually disputed. Instead, the record

shows that Section XXXI.A.3 was the product of voluntary negotiation and agreement between MFS/WorldCom and USWC.

14. On October 4, 1996, WorldCom and USWC jointly submitted a position statement ("WorldCom–USWC Joint Position Statement" or "Statement"). As the parties stipulated, the WorldCom–USWC Joint Position Statement removed from the Commission's consideration issues resolved by the parties. Statement of Stipulated Facts at ¶ 34. The opening paragraph of the Statement provided that:

MFS[ ] and [USWC] have reached agreement on a substantial number of issues. The following draft agreement represents those areas of agreement between the parties. *In those areas where no agreement has been reached, the draft Agreement provides language that describes the USWC and MFS positions on the disputed issues.* Such language is identified by bold characters with a shaded background. The areas where no agreement has been reached shall be resolved through the ongoing arbitration proceedings.

R. 14851 (emphasis added). Section XXXI.A.3 of the proposed Agreement is in plain type, thus indicating that agreement had been reached on that issue.

15. At oral argument before the Court on September 22, 1998, and in its Findings of Fact, USWC alleges that Sections XXXI.A.3 and XXXI.A.2 of the proposed Agreement were offered as a "package" and that USWC only agreed to Section XXXI.A.3 if the Commission adopted Section XXXI.A.2. USWC's proposed section XXXI.A.2 would have read as follows:

This Agreement provides for the provision of Unbundled Loops to MFS which may be connected with MFS's switch for the purpose of offering a finished retail service. In addition, USWC agrees to provide an Unbundled Switching Element to MFS pursuant to the NIUER Process which may be combined with

MFS-provided loops to provide a finished retail service. USWC will not combine USWC's Unbundled Loops with USWC's Unbundled Switching Element to provide a finished service to MFS. USWC agrees, however, to offer finished retail services to MFS for resale pursuant to Section XXX, Resale, of this Agreement.

J.A. Vol. VIII, Tab 64, at 14931. In the proceedings below, WorldCom objected to Section XXXI.A.2 of the Agreement and that Section was rejected by the Commission.[6] J.A. Vol. X, Tab 84, at 5738–40 (concluding that "the Agreement shall not include any restrictions on the bundling of network elements to offer services").

16. The plain text of the Statement provides no indication that USWC conditioned paragraph three on the adoption of paragraph two, nor is there any indication that USWC disputed paragraph three. To the contrary, by including Section XXXI.A.3 in plain text, the Statement provides affirmative evidence that USWC voluntarily agreed to that section. If USWC intended Section XXXI.A.2 to place a limitation on XXXI.A.3, it should have so indicated in the text of the disputed language (XXXI.A.2) presented to the Commission. In the alternative, USWC could have shown a linkage between the two paragraphs by beginning XXXI.A.3 with the phrase "Subject to XXXI.A.2 above," or other similar limiting language.

17. Testimony by USWC witness Owens, the witness that sponsored and explained the purpose and content of the Statement before the Commission, also provides evidence that USWC voluntarily agreed to Section XXXI.A.3 and did not

request the Commission to arbitrate that language. Owens testified that USWC and WorldCom "have substantial language that we've *reached agreement* on resale and *unbundling.*" Tr. Vol. 9, 165:16–17 (emphasis added).

18. Accordingly, the Court concludes that any duty to combine on the part of USWC appears to be the result of negotiations between the parties, not the result of a dispute resolved through arbitration. Nonetheless, USWC argues that it preserved this issue by raising the duty to combine issue at the arbitration. In support thereof, USWC cites in its proposed Findings of Fact and Conclusions of Law to the direct testimony of Jess Owens on October 2, 1996, at p. 6, A. 11, R. 03555.

19. The Court has reviewed the testimony cited by USWC in its Findings of Fact and at the hearing and concludes that this testimony does not relate to the duty to combine argument. Instead, the testimony relates only to USWC's argument that the CLECs should not be allowed to use UNEs to provide a finished service at cost-based prices (the "sham unbundling" claim).[7] Similarly, in USWC's reply brief on the merits and during the September 22, 1998 oral argument. USWC argues that it preserved the duty to combine issue in its Closing Statement before the Commission. *See* USWC Reply Br. at 6; Tr. of 9/22/98 Hrg. at 54. That document makes clear, however, that the issue raised during the arbitration by USWC concerned the pricing scheme that applies when new entrants use network elements to replicate a finished service (again, the sham unbundling claim), not whether USWC can be required to provide combi-

6. USWC did not request reconsideration of this decision by the Commission in its Application for Rehearing, Reargument, or Reconsideration ("RRR"). *See,* J.A. Vol. X, Tab 85.

7. *See also* Test. of Robert Harris, at 32–36 (J.A. Vol. 1, Tab 4, at 569–573) ("[s]ham unbundling allows new entrants to arbitrage the resale of local exchange service"); Test. of Brian Johnson, at 52 (J.A. Vol. 1, Tab 6, at 893) ("a CLEC can reassemble a U.S. WEST

service simply by purchasing all of the unbundled network elements that comprise [sic] the service, without self-provisioning any element. In this manner, a CLEC can completely circumvent the resale provisions of the Federal Act"); *id.* at 61 (R. 902) ("the Commission should [not allow] CLECs to re-assemble existing services solely through the separate purchase of network elements").

nations. *See* USWC's Closing Statement, at 18–19 (J.A. Vol. 1, Tab 15, at 4472–73).

20. I further find that USWC did not raise the duty to combine issue in the separate Sprint arbitration. As it did during the consolidated arbitration, USWC argued in the USWC–Sprint arbitration that allowing Sprint to combine UNEs into a finished telecommunications service (the "sham unbundling" argument) would result in price arbitrage and harm competition. *Sprint Communications Co. L.P. Petition for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with USW. Communications, Inc.*, Docket No. 96A–426T, Decision No. C97–41, Order Denying, in Part, and Granting, in Part, Exceptions to Recommended Decision No. R96–1281, at 10 (CPUC Jan. 8, 1997) ("Comm'n Dec.") (J.A. Vol. 11, Tab 109). Similarly, in its exceptions to the Administrative Law Judge's recommended decision, USWC only challenged whether Sprint should be permitted to combine UNEs into finished telecommunications services. *Id.*, USWC's Exceptions to Recommended Decision, at 9–11 (Dec. 18, 1996) (J.A. Vol. 11, Tab 118). These "sham unbundling" arguments did not raise or encompass the distinct issue of whether USWC can be required to combine UNEs on Sprint's behalf and/or to refrain from separating currently combined elements in its network (the "duty to combine" claim).

21. Although I find that USWC did not rise the duty to combine argument at the actual arbitrations, I find that USWC did raise this issue in its Motion for Reconsideration filed with the CPUC in the AT & T and MCI dockets after *Iowa Utilities Board v. Fed. Communications Comm'n,* 120 F.3d 753 (8th Cir.1997) was decided in a way that was favorable to USWC's argument.[8] Specifically, the CPUC had based its decision to require combinations and to allow sham unbundling on FCC Rule

51.315(b), *see* Order on Request for Reconsideration and Rehearing, R. 25377, which was appealed by U.S. WEST and numerous other parties. On July 18, 1997 the Eighth Circuit Court of Appeals invalidated Rule 51.315(c)–(f) and on October 14, 1997 the same court invalidated Rule 51.315(b). *Iowa Utilities Board,* 120 F.3d at 813.

22. In response to the Eighth Circuit decision, on August 8, 1998, USWC filed its brief in CPUC Arbitration Docket Nos. 96A–345T and 96A–366T on the impact of the opinion on the AT & T and MCI agreements, seeking to have the CPUC delete all the sections of the contracts which required combinations. In these proceedings, USWC filed numerous pleadings raising the issue of deleting the combination requirements from the contracts. *See* USWC Brief on the Impact of the Opinion of the United States Court of Appeals for the Eighth Circuit on the USWC Interconnection Agreements with AT & T and MCImetro; p. 1 and 2, R. 26968–69 ("USWC also attempts to identify provisions of the interconnection agreements potentially affected by the Eighth Circuit's Opinion, and which the Commission, as a result, may have to modify.... The Eighth Circuit stated in no uncertain terms that the section 251(c)(3) obligation does not extend to assembling or combining these elements on behalf of a competitor"); Motion of USWC to Reject or Modify Arbitrated Interconnection Agreement, July 22, 1997, p. 3, A. 35, R. 21948 ("The Opinion of the Eighth Circuit in *Iowa Utilities Board v. FCC,* issued on July 18, 1997, will require the Commission and parties to re-examine a number of central issues that permeate the entire U.S. WEST MCI interconnection agreement"); *see also* Application for Rehearing, Reargument, and Reconsideration of USWC (J.A. Vol. 7, Tab 36, at 25298); Second Application for Rehearing, Reargument

8. It appears that no such motion was made in the WorldCom, ICG and TCG dockets because the CPUC decisions and the interconnection

agreements in those dockets were already on appeal before this Court.

and Reconsideration and Petition for Expedited Declaratory Ruling of USWC, 96A–345T and 96A–366T, Oct. 22, 1997, R. 27384.

23. It appears that the CPUC understood that USWC was opposing a requirement to combine UNEs in connection with its motion for reconsideration:

USWC's application for RRR sets forth one request: that the interconnection agreement be modified to eliminate the requirement that the Company combine unbundled network elements for AT & T.

Order re: Rehearing, Reargument and Reconsideration, Oct 8, 1997, p. 2, A. 100, R. 25376.

USWC's current request to modify the agreement is based upon a recent decision by the Eighth Circuit Court of Appeals which, according to the Company, invalidates the Commission's prior order regarding the bundling of network elements into finished services.

Order Rejecting Rehearing, Reargument and Reconsideration, Nov 14, 1997, p. 2, A. 101, R. 27377.

24. The Commission issued several orders refusing to delete or modify the duty to combine provisions in light of the Eighth Circuit's decision. Docket No. 96A–345T, Dec. Nos. C97–1035, A. 100, R25375 and Docket No. 96A–366T, Dec. Nos. C97–1210; A. 101, R27376; C97–1036, A. 106, R2649; and C97–1209, A. 102, R. 27455.

25. Sprint argues that, even if USWC had raised or otherwise preserved this claim below, the combinations issue would be premature because the parties negotiated the following binding alternative dispute resolution ("ADR") provision in the Sprint Agreement:

The Parties recognize that the FCC is promulgating rules addressing issues contained in this Agreement. In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any

respect under law or regulation, the parties will negotiate in good faith for replacement language. If replacement language cannot be agreed upon, either party may seek regulatory intervention, including negotiations pursuant to Sections 251 and 252 of the Act.

Sprint Agreement § 36.7 (J.A. Vol. 11, Tab 112, at 1704–05).

26. *The Separate Pricing Docket.* The CPUC severed the pricing issues in the arbitration from the nonpricing claims and deferred the pricing claims to a separate pricing docket, known as Docket No. 96S–331T. *See* AT & T Arbitration Decision, at 16–17 (J.A. Vol. 10, Tab 93, at 10318–19).

27. On February 18, 1998, the CPUC issued its Decision Regarding Commission Authority to Require Combination of Network Elements, Decision No. C98–267 (Feb. 18, 1998) ("Combination Decision"), in the 331T Docket, wherein it determined that the CPUC had authority under state law to require USWC to combine network elements. *Id.* at 10. The CPUC concluded, however, that the determination of "[w]hether such an order is proper depends upon the factual investigation presently being conducted in this case" and that determining whether USWC's proposed method of providing access to network elements is "discriminatory, unjust, and unreasonable" "constitutes a factual assertion which must be considered in light of the evidentiary hearing." *Id.*

28. The CPUC held hearings in the 331T Docket on USWC's proposal for enabling new entrants to combine network elements on April 20 and 21, 1998. On October 28, 1998, the CPUC issued its Commission Order on Rehearing, Docket No. 96S–331T, Decision No. C98–1047 (CPUC Oct. 28, 1998) ("331T Order on Rehearing"), in that docket. That Order rejected USWC's so-called Single Point of Termination or "SPOT" Frame proposal for providing new entrants with access to network elements based on the record evi-

dence before the CPUC in that docket. Among other things, the CPUC concluded that the SPOT Frame proposal "introduces unnecessary points of failure into the telephone network," 331T Order on Rehearing, at 12, is "inefficient and would result in unnecessary service disruption to customers." *id.* at 13, needlessly raises costs, and is "discriminatory and therefore violates the federal Act." *Id.* at 15. The CPUC therefore concluded that because USWC's proposal for permitting new entrants to combine UNEs should be rejected, USWC instead must combine network elements for CLECs. It made clear, however, that USWC "is not precluded from making a future proposal for CLECs to combine UNEs themselves." *Id.* at 16.

29. As of the hearing in this case in September of 1998, no party had appealed the Combination Decision or the 331T Rehearing Order to this Court, and the CPUC record in that docket was not before the Court. Moreover, no party in this case had briefed any issue regarding the compliance of USWC's SPOT frame proposal with the Act or state law. In addition, this Court previously determined that it would consider the pricing issues separately from the nonpricing issues. *See U.S. West Communications, Inc. v. Hix,* No. 97–D–152, Order (D.Colo. Jan. 14, 1998). Finally, this issue has now been extensively briefed in connection with the briefs filed on pricing, and it appears the parties have agreed that this issue should be deferred until the hearing on pricing issues. Accordingly, the Court defers until the hearing on pricing set for April 20 and 21, 2000, any ruling in connection with the CPUC's decision in the 331T Docket, wherein it concluded that the CPUC had authority under state law to require USWC to combine network elements. *Id.* at 10.[9]

### B. *Conclusions of Law*

■ 1. *Sham Unbundling Claim (Using Network Elements to Provide a Finished Service).* As stated above, USWC argues that certain provisions of the Interconnection Agreements violate the Telco Act because the Act prohibits the CLECs from obtaining unbundled network elements at cost-based rates and using those elements to provide finished telecommunications services. Because this issue involves the CPUC's compliance with the Act and the FCC's implementing regulations, the Court reviews this issue *de novo. US West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997).

2. Section 251(c)(3) of the Act provides that "[a]n incumbent local exchange carrier shall provide ... unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." In its First Report and Order, *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 F.C.C.R. 15499, 1996 WL 452885 (1996) ("*Local Competition Order*"), the FCC rejected the precise arguments raised by USWC here and held that the Act permits new entrants to replicate a finished service using only network elements and that those entrants need not have their own facilities to do so. *Id.* ¶¶ 331, 340.

3. In their comments to the FCC, ILECs such as USWC raised the same facilities-based and price arbitrage arguments that USWC makes here. *Id.* ¶¶ 318, 321, 322. The FCC rejected each of these arguments. Noting that "sections 251(c)(3) and 251(c)(4) present different opportunities, risks, and costs in connection with entry into local telephone markets," *Local Competition Order* ¶ 331, the FCC "reject[ed] the argument that requiring carriers to own some local exchange facilities would promote competition for local exchange services, or that we should

---

9. The Court also defers until the pricing hearing MCI's related challenge that limits MCI's ability to order combinations of network elements from USWC, which MCI has included in the CLECs' Proposed Findings of Fact and Conclusions of Law filed April 5, 2000.

impose such a requirement for other policy reasons." *Id.* ¶ 340. The FCC also promulgated regulations allowing new entrants to use network elements to replicate a finished telecommunications service. *See, e.g.,* 47 C.F.R. § 51.309(a).

4. The CPUC did not err in applying the FCC's *Local Competition Order* in conducting the arbitrations and in approving the Interconnection Agreements. *See* 47 U.S.C. § 252(c)(1), (e)(2)(B); *Local Competition Order* ¶ 134; *see also Chrysler Corp. v. Brown,* 441 U.S. 281, 295–296, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) ("well established" that agency regulations have force and effect of law).

5. USWC and other incumbents challenged the FCC's regulations on appeal. In *Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 814 (8th Cir.1997), the Eighth Circuit affirmed the FCC's regulations, holding that "the FCC's determination that a competing carrier may obtain the ability to provide telecommunications services entirely through an incumbent LEC's unbundled network elements is reasonable, especially in light of our decisions regarding the validity of other specific FCC rules." *Id.* at 814. Further, the Eighth Circuit indicated that "we believe that the plain language of subsection 251(c)(3) indicates that a requesting carrier may achieve the capability to provide telecommunications services completely through access to the unbundled elements of an incumbent LEC's network." *Id.*

6. In so holding, the Eighth Circuit specifically rejected the arguments made herein by USWC that allowing a CLEC to purchase the right to obtain unbundled access to an ILEC's network at the less expensive cost-based rate allows the CLEC to circumvent the more expensive wholesale rates that the Act requires for resale of a telecommunications service. *Id.* at 814–15. Further, the Eighth Circuit rejected USWC's argument that allowing the CLECs to provide services at cost allows them to circumvent the Telco Act's restriction on joint marketing of local and long-distance service contained in subsection 271(e)(1). *Id.*

7. Although the United States Supreme Court affirmed in part and reversed in part the Eighth Circuit's decision in *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), this issue was not addressed and, accordingly, was not reversed. Accordingly, the Court finds the Eighth Circuit's decision controlling on this issue.

8. The other federal district courts that have addressed "sham unbundling" claims by incumbents have concluded that *Iowa Utils. Bd.* and the FCC's rules preclude those claims. *See Southwestern Bell Tel. Co. v. AT & T Communications of the Southwest,* No. A97–CA–132 SS, Order at 15, 1998 WL 657717 (W.D.Tex. Aug. 31, 1998); *GTE South Inc. v. Morrison,* 6 F.Supp.2d 517, 531 (E.D.Va. May 19, 1998); *U.S. West Communications v. Jennings,* No. CIV–97–0026, Order at 4–5 (D.Ariz. March 31, 1998); *U.S. West Communications v. Jennings,* Nos. CIV–97–0026–PHX–RGS & CIV–97–0394–PHX–RGS, Order at 4–6 (D.Ariz. March 31, 1998); *U.S. West Communications v. Jennings,* Nos. CIV–97–0026–PHX–RGS & CIV–97–0027–PHX–RGS, Order at 2–5 (D.Ariz. March 31, 1998); *US West Communications v. TCG Seattle,* No. C97–354WD, Order on Motions for Summary Judgment at 8 (W.D.Wash. Jan. 22, 1998); *US West Communications v. MFS Intelenet,* No. C97–222WD. Order on Motions for Summary Judgment at 6 (W.D.Wash. Jan. 7, 1998).

9. Based upon the foregoing, the CPUC properly rejected USWC's "sham unbundling" argument. The CPUC recognized that the restrictions on the use of combined network elements sought by USWC are contrary to the FCC's *Local Competition Order. See, e.g., In re: Interconnection Contract Negotiations Between AT & T and U.S. West,* Docket No. 96A–345T, Decision No. C96–1231, Decision Regarding Petition for Arbitration, at

67–68 (CPUC Nov. 27, 1996) (J.A. Vol. 10, Tab 93, at 10369–70) ("AT & T Arbitration Decision").

10. Accordingly, the Court also RE-JECTS USWC's sham unbundling claim and AFFIRMS the provisions of the Interconnection Agreements challenged by USWC that permit new entrants to use unbundled network elements purchased at cost-based rates to replicate a finished telecommunications service without the new entrant using its own facilities.

■ 11. *Duty to Combine Claim.* The Court first addresses the CLECs' arguments that the Court does not have jurisdiction to review this claim. As stated earlier, the CLECs argue that USWC is precluded from raising this issue because the provisions requiring combinations in the Interconnection Agreements were negotiated and agreed to and the issue was not, therefore, raised in the arbitration proceedings. As I stated in the Findings of Fact, I agree with the CLECs that the issue of the duty to combine appears to have been negotiated to by the parties. As I also stated in the Findings of Fact, it does not appear that USWC ever raised this as a disputed issue in the arbitration. Nonetheless, USWC did raise the issue with the CPUC as soon as the Eighth Circuit's decision in *Iowa Utilities Board* was rendered which found that an ILEC cannot be required to combine network elements for the CLECS or to provide existing combinations. In other words, USWC raised the issue as soon as practicable after the law substantially changed on this issue.

12. Under this circumstance, I find that USWC should not be precluded from raising this issue. *See U.S. West Communications, Inc. v. Garvey,* No. 97–913 ADM/AJB, slip op. (D.Minn. Apr. 20, 1999) (§ 252(e)(6) "creates no limitation as to the matters to be considered by the district court, save the matters must involve an agreement and the party bringing the action must be aggrieved. There is neither an explicit or implicit requirement that the issue must have previously been presented to the state commission.... Moreover, the law has changed ... [and][t]his court need not refrain from applying the current law"); *AT & T Communications of Southern States, Inc. v. Bell-South Telecommunications, Inc.,* 7 F.Supp.2d 661, 670 (E.D.N.C.1998) (even though ILEC voluntarily agreed to combine network elements at AT & T's request, this was agreed to merely to adhere to established FCC rules which were later invalidated—"[i]t would stretch the bounds of imagination to construe [that paragraph] as a voluntary agreement to override § 251(c)"; *review of paragraph was appropriate because "[f]ederal law has changed on this matter and [the paragraph] is no longer consistent with that law"); MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.,* 7 F.Supp.2d 674, 680 (E.D.N.C.1998) (court agreed that MCI could object to provision that had previously been agreed to because "statute itself allows parties aggrieved by any section of the Agreement to appeal to this court" and "[t]o hold otherwise would be to rely on an exhaustion of state remedies argument which does not seem to apply here, where Congress has devised an entirely new scheme"); *MCI Telecommunications Corp. v. U.S. West Communications. Inc.,* Case No. C97–1508R, 1998 U.S.Dist. LEXIS 21585 (W.D.Wash. July 21, 1998), *aff'd in part, rev'd in part on other grounds,* 204 F.3d 1262 (9th Cir. Mar.2, 2000) (Jul. 21, 1998) (MCI's argument that USWC waived any challenge to the combining provisions because it did not raise this particular issue before the [state commission] is immaterial because the arbitrator applied an FCC interpretation of the law that has since been repudiated and the court does not have to refrain from applying the current law).

13. I further find that USWC is not precluded from asserting this claim because of any alternative dispute resolution ("ADR") provision in the Sprint Agree-

ment or any other Interconnection Agreement. *See MCI Telecommunications Corp. v. U.S. West Communications,* Slip Op. at 7 ("exhaustion of agreement's dispute resolution mechanism is inapt" because "the Act provides that 'any party aggrieved' by a state commission's determination may bring a federal court action to determine whether an agreement contradicts the Act" and the "agreement's dispute resolution clause does not purport to deprive the court of this power, or purport to be a mandatory first step"); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.,* 7 F.Supp.2d at 680 (exhaustion of remedies not applicable).

14. In any event, I find that USWC did attempt to exhaust its administrative remedies by raising this issue numerous times to the CPUC. On October 22, 1997, shortly after the Eighth Circuit issued its decision on rehearing, USWC filed a petition to reform the agreements in accordance with the Eighth Circuit decision and to stay all unlawful provisions. (R. 98). The CPUC denied that petition and several other previous and subsequent attempts. (R. 105). I find that requiring USWC to attempt to "voluntarily negotiate in good faith" for replacement language with Sprint, as required by the USWC–Sprint Interconnection Agreement (J.A. v. 11, Tab 112, § 36.7, p. 1704), would be futile in light of the fact that Sprint did not agree to change the combination provision of the agreement even after the FCC rule was invalidated by the Eighth Circuit and after USWC briefed this issue with the CPUC.

15. Turning to the merits, as discussed previously, there are two distinct components to this claim. First, USWC argues that it should be allowed to unbundle already combined network elements before selling them to the CLECs. Second, USWC argues that it should not be required to combine network elements that are not already combined and sell those combinations to the CLECS.

16. As to the first component of the claim, that USWC should be allowed to unbundle already combined network ele-ments before selling them to the CLECs, this has been definitely decided in favor of the CLECs and against USWC by the United States Supreme Court. The issue was initially decided in favor of USWC by the Eighth Circuit in *Iowa Utilities Board.* It originally left intact FCC Rule 315(b) (47 C.F.R. § 51.315(b)) that provided that "an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines." However, it later modified its decision and vacated this rule as "contrary to 47 U.S.C. § 251(c)(3) because the rule would permit the new entrant access to the incumbent LEC's network elements on a bundled rather than an unbundled access." *Iowa Utilities Board,* 120 F.3d at 813.

17. The United States Supreme Court reversed the Eighth Circuit on this issue, holding that it could not "say that Rule 315(b) unreasonably interprets the statute." *AT & T Corp.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835. The Supreme Court further held in this regard:

> The reality is that § 251(c)(3) is ambiguous on whether leased network elements may or must be separated, and the rule the Commission has prescribed is entirely rational, finding its basis in § 251(c)(3)'s nondiscrimination requirement.... It is true that Rule 315(b) could allow entrants access to an entire preassembled network. In the absence of Rule 315(b), however, incumbents could impose wasteful costs on even those carriers who requested less than the whole network. It is well within the bounds of the reasonable for the Commission to opt in favor of ensuring against an anticompetitive practice.

*Id.*

18. Based on the Supreme Court's ruling, FCC Rule 315(b) is now reinstated, and the CPUC did not err in approving the sections of the Interconnection Agreements that require USWC to provide already combined network elements based upon this rule. The Court thus AFFIRMS the CPUC's decision and rejects USWC's argument in this regard.

19. The second component of this claim is that USWC should not be ordered to combine network elements that are not already combined and sell these to the CLECs. As referenced above in the Findings of Fact, the CPUC in the pricing docket (the 331T Docket) issued its Decision Regarding Commission Authority to Require Combination of Network Elements, Decision No. C98–267 (Feb. 18, 1998) ("Combination Decision"), wherein it concluded that it had authority under state law to require USWC to combine network elements. *Id.* at 10. This issue has been extensively briefed in connection with the briefs on pricing, and I find that this issue should accordingly be DEFERRED to that phase of the case. The Court also DEFERS MCI's related challenge regarding restrictions of its ability to obtain combinations of network elements from USWC. Argument on these issues will be heard at the hearing currently scheduled for April 20 and 21, 2000.

20. In conclusion, for the reasons stated above, the Court finds USWC's sham unbundling argument to be without merit. Further, the Court finds that USWC's challenge to the portions of the Interconnection Agreements that require it to sell already existing combinations of network elements to the CLECs is without merit. Accordingly, Count One of the Complaints in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 is DISMISSED IN PART to the extent that this Count encompasses the above issues. To the extent that Count One is based on the duty to combine argument, this is DEFERRED until the hearing on April 20 and 21, 2000.

## II. USWC'S DIRECTORY LISTINGS CLAIM (U.S. WEST DEX)

### A. *Findings of Fact*

1. USWC challenges certain provisions relating to directory listings in its Agreements with AT & T, MCI, and TCG. Among other things, the AT & T and MCI Agreements ensure that customers of AT & T and MCI will have their directory listings included on a nondiscriminatory basis in the yellow pages of the phone book and other directory listings published by USWC or its affiliate U.S. West Dex ("Dex"). The TCG Agreement allows TCG nondiscriminatory access to the customer guide pages in the customer directory published by Dex for USWC.

2. USWC contends that these provisions of the Agreements must be stricken for several reasons. First, USWC argues that the CPUC did not have the authority to impose conditions on Dex since Dex is a separate corporate entity from USWC and is not subject to regulation by the CPUC or the Act as a telecommunications carrier or an ILEC. Second, USWC submits that the Act does not require USWC to provide the disputed directory publishing services to CLECs. Instead, all the Act requires is that USWC provide the CLECs with nondiscriminatory access to "directory listings", which at most requires that the new entrants' customers be listed in the white pages.[10] Finally, USWC argues that since publishing is a deregulated service, the CPUC has no authority to regulate it under state law.

3. USWC urges the Court to follow the decisions of several district courts that have struck similar directory publishing requirements, citing *MCI Telecommunications Corp. v. Michigan Bell Tel. Co.*, 79 F.Supp.2d 768, 792–93 (E.D.Mich.1999); *US West Communications, Inc. v. Garvey*, File No. Civ. 97–913 ADM/AJB, slip op. at 38–40 (D.Mich.1999); and *MCI Telecommunications Corp. v. U.S. WEST Communications, Inc.*, Case No. C97–1508R, 1998 U.S.Dist. LEXIS 21585 (W.D.Wash.1998),

---

10. In its reply brief and at oral argument on this issue, USWC argued for the first time that it is not required by the Act to publish *any* directory listings for the new entrants' customers, including the white pages, but rather is merely required to give the new entrants access to the information contained in the directory listings published by Dex.

*aff'd in part, rev'd in part on other grounds,* 204 F.3d 1262 (9th Cir. Mar.2, 2000).

4. The challenged provisions of the AT & T and MCI Agreements are identical. The AT & T agreement reads as follows:

6.1.5.1 This Section 6.1.5 pertains to Listings requirements published in any media, including, but not limited to, traditional white/yellow pages, specialty directories, CD ROM, or other printed or electronic formats. As stated under 6.1.4.1, USWC shall ensure that listings in any media do not discriminate against AT & T customers.

6.1.5.3 USWC shall not sell or license, nor allow any third party, the use of AT & T subscriber listings without the prior written consent of AT & T. Upon consent, AT & T shall receive its pro-rata share of any amounts paid by third parties to USWC for such information. USWC shall not disclose nor allow any third party to disclose non-listed name or address information for any purpose other than what may be necessary to complete directory distribution.

6.1.5.4 AT & T subscriber listings shall be interfiled with listings of USWC and other AT & T subscribers.

6.1.5.5 Each AT & T subscriber account number shall be provided, at no charge, the same white page basic listings that USWC provides its subscribers. USWC will provide AT & T the ability to sell its customers premium white pages listings....

6.1.5.6 Each AT & T business subscriber account number shall be provided, at no charge, the same yellow page basic listings that USWC provides its subscribers.

6.1.5.7 USWC shall also publish, or ensure that any third party publishes, all types of listings for AT & T subscribers that are available to USWC subscribers under the same rates, terms, and conditions. including but not limited to:

6.1.5.7.1 Foreign listings

6.1.5.7.2 Reference listings

6.1.5.7.3 Information listings

6.1.5.7.4 Alternate call listings

6.1.5.7.5 Multi-line listings

6.1.5.7.6 Multi-line/Multi-owner listings dates

6.1.5.12 USWC shall agree, or ensure a third party agrees, to accept and publish directory advertising from AT & T subscribers on a non-discriminatory basis and bill subscribers directly for any white or yellow pages advertising.

J.A. Vol. 13, Tab 126, at 25239–40; *see* J.A. Vol. 13, Tab 138, at 268386–87 for the MCI Agreement.

5. The challenged portion of the TCG Agreement provides that "TCG's access to customer guide pages in USWC's directories shall be provided in accordance with Paragraph 3, page 48 of the Commission's [CPUC's] Order." J.A. Vol. 12, Tab 122, at 6877. Paragraph 3, page 48 of the CPUC's Order, referenced in the TCG agreement, in turn provides:

We conclude that our rules require provision of specific information on the customer guide pages for CLEC's within the directory published for USWC. In terms of the TCG request that the number of customer guide pages provided to TCG be equivalent to that provided to USWC in the directory, we shall not approve this request as proposed by TCG. However, TCG should have available to it the same terms and conditions available to USWC from the directory publisher for provision of customer guide pages and shall be entitled to at least the same number of customer guide pages within the directory as are provided to USWC with the USWC logo.

J.A. Vol. 10, Tab 87, at 6759.

6. In addition, the CPUC's Order Denying Applications for Rehearing, Reargument or Reconsideration in the TCG arbitration, provides:

We believe that our rules regarding directory white pages are entirely within our authority. As USWC shall provide

appropriate space in the call guide pages for competing providers' information (See rule 5.12.6), USWC must transmit this information to and make adjustments with Direct to provide call guide pages to TCG, on a nondiscriminatory basis, with the same terms and conditions that are provided to USWC.

*In re TCG Colorado Petition for Arbitration Pursuant to 47 U.S.C. § 252(b) of Interconnection Rate, Terms and conditions with U.S. West Communication, Inc.*, Docket No. 96A–329T, Decision No. C96–1344 at 22–23 (CPUC Dec. 18, 1996) (J.A. Vol. 10, Tab 88, at 6949–50).

7. USWC opposed the directory listing requirements in its testimony and briefs before the CPUC. Test. of Brian Johnson, September 6, 1996, 96A–287T, p. 325, A.6, R. 01165–66; USWC RRR, January 15, 1997, p. 6, A. 38, Motion of USWC to Reject or Modify Arbitrated Interconnection Agreement, July 22, 1997, p. 4., A. 35.

8. In defending the challenged provisions, the CLECs argue that the Act and FCC regulations requiring ILECs such as USWC to provide "nondiscriminatory access" compel USWC to publish directory listings for the CLECs on the same terms and conditions as USWC's own customers are published. This duty extends to formats beyond the white pages. Moreover, the CLECs contend that USWC may not escape this obligation due to the fact that USWC publishes its customers' directory listings through an affiliate, Dex.

9. It is undisputed by the parties that Dex is an affiliate of USWC, and USWC admitted this before the hearing. Test. of USWC Witness Johnson at 336 (J.A. Vol. 8, Tab 62, at R. 14352.)

## B. *Conclusions of Law*

■ 1. For the reasons set forth below, I agree with the CLECs that the challenged directory listing requirements are authorized by the Act and FCC regulations. Accordingly, USWC's challenge to

this portion of the Interconnection Agreements fails.

2. Since the instant issue involves the CPUC's interpretation of federal law under the Act and FCC regulations, this Court reviews the directory listings requirement *de novo*. *US West Communications, Inc. v. Hix*, 986 F.Supp. 13, 18–19 (D.Colo.1997).

3. The well-known purpose of the Act is to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." S.Conf. Rep. No. 104–230, at 1 (1996); Federal Communications Commission, *Second Report & Order and Mem. Opinion and Order, In the Matters of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 11 F.C.C.R. 19392 at ¶ 1, 1996 WL 819798 (August 8, 1998) (*Second Report & Order*) (quoting S.Conf.Rep. No. 104–230). Speaking to the issue of directory listings, the FCC explained how nondiscriminatory access to directory listings furthers the overall purpose of the Act:

Dialing parity [which includes directory listings], nondiscriminatory access, network disclosure, and numbering administration issues are critical issues for the development of local competition. As stated in the First Report and Order, incumbent local exchange carriers have little incentive to provide access to potential competitors to their networks. In other words, potential competitors in the local and long distance markets face numerous operational barriers to entry notwithstanding their legal right to enter such markets. The dialing parity, nondiscriminatory access, and network disclosure requirements should remove those barriers to entry. The rules we adopt herein will benefit consumers by making some of the strongest aspects of local carrier incumbency—the local dialing, telephone numbers, operator services, directory assistance, and directory

listing—available to all competitors on an equal basis.

*Second Report & Order,* 11 F.C.C.R. 19392 at ¶ 3.

4. The Act explicitly requires USWC, as an ILEC, to provide CLECs with "nondiscriminatory access to ... directory listing". 47 U.S.C. § 251(b)(3). The FCC explained "nondiscriminatory access" to mean the following:

> Section 251(b)(3) requires that each LEC, to the extent it provides telephone numbers, operator services, directory assistance, and/or directory listings for its customers, must permit competing providers nondiscriminatory access to these services. Any standard that would allow a LEC to permit access that is inferior to the quality of access enjoyed by the LEC itself is not consistent with Congress' goal to establish a procompetitive policy framework.

*Second Report & Order,* 11 F.C.C.R. 19392 at ¶ 102.

5. Nondiscriminatory access is also defined by the FCC in its regulations as follows:

> 'Nondiscriminatory access' refers to access to telephone numbers, operator services, directory assistance and directory listings that is at least equal to the access that the providing local exchange carrier (LEC) itself receives. Nondiscriminatory access includes, but is not limited to: (i) Nondiscrimination between and among carriers in the rates, terms, and conditions of the access provided; and (ii) The ability of the competing provider to obtain access that is at least equal in quality to that of the providing LEC.

47 C.F.R. § 51.217(a)(2)(i)–(ii) (1998).

6. "Directory listings" are defined as any information:

> (1) Identifying the listed names of subscribers of a telecommunications carrier and such subscriber's telephone numbers, addresses, or primary advertising classifications (as such classifications are assigned at the time of the establishment of such service), or any combination of listed names, numbers, addresses or classifications; *and (2) That the telecommunications carrier or an affiliate has published, caused to be published, or accepted for publication in any directory format.*

47 C.F.R. § 51.5 (emphasis added).[11]

7. The FCC subsequently issued an order clarifying the incumbent carriers' obligations under the Act to provide nondiscriminatory access to "directory listing." *In Re Implementation of the Telecommunications Act of 1996,* Third Report and Order in CC Docket No. 96–115, Second Order on Reconsideration of the Second Report and Order in CC Docket No. 96–98, and Notice of Proposed Rulemaking in CC Docket No. 99–273 (Sept. 9, 1999) (*"Directories Order"*).

8. In the *Directories Order,* the FCC ruled that the "directory listing" obligation of § 251(b)(3) "is most accurately reflected by the suggestion of MFS and Bell Atlantic that directory listing be defined as a verb that refers to the act of placing a customer's listing information in a directory assistance database or in a directory compilation for external use (such as white pages)." *Id.,* ¶ 160. The FCC also revised its regulations to eliminate any confusion between the "directory listing" obligation of § 251(b)(3) and the references in the FCC's regulations to "directory listings," which refer to providing access to the information in a directory. *See id.;* 47 C.F.R. § 51.217(c)(3)(ii); *Directories Order,* Appendix D.[12] The *Directories Order*

---

**11.** The FCC concluded in its Second Report and Order that based on the record before it, it did not need to "state that the term 'directory assistance and directory listings' includes the White Pages, Yellow Pages, 'customer guides,' and informational pages. As a mini-

mum standard ... 'directory listing' ... is synonymous with the definition of 'subscriber list information' in section 222(f)(3)." *Second Report & Order,* 11 F.C.C.R. 19392 at ¶ 137.

**12.** Finally, the FCC clarified that "it is not necessary for the Commission to describe di-

is binding on this Court. *Michigan Bell Telephone Co.*, 79 F.Supp.2d at 800.

9. In light of the *Directories Order*, I reject USWC's contention that the directory listings provisions of the Act and FCC regulations do not require USWC to act as a directory publisher for the various CLECs. It is now clear that USWC does not just have to provide access to the information contained in its directories. Instead, it must actually place a customer's listing information in its directories. *Directories Order*, ¶ 160. Further, it must place the listing information in its directories in a nondiscriminatory manner, meaning that USWC must place this information on terms and conditions that are equal to those provided to USWC's own customers. *See* 47 C.F.R. § 51.217(a)(2)(i)–(ii).

10. One of the cases relied on by USWC, the *Michigan Bell* case, actually supports this holding, and does not support USWC's position. The United States District Court for the District of Minnesota originally held that there was no requirement to list a CLECs' customers in the yellow pages because an incumbent or its affiliate only had to provide "access to directory listings," rather than including the CLECs' customers in its directories. *Id.*, 79 F.Supp.2d at 792–93. However, the court later granted MCI's motion to alter or amend the court's opinion and order on this issue. *Id.* at 801–02. Specifically, it held that "[a]t the time it issued its Opinion, the Court was not aware that the FCC had just clarified the meaning of 'directory listing' in section 251(b)(3)." *Id.* at 801. "The FCC explained that the reference to 'directory listing' in section 251(b)(3) refers to the act of listing a customer in a directory." *Id.* "The Directories Order is now binding on this Court." Indeed, that court rejected the incumbent's argument that it could not be required to publish a CLEC's

customers in its yellow pages because it did not publish a yellow pages directory as "specious", and concluded that "the MPSC's yellow pages ruling was in error, as was this Court's September 29, yellow pages ruling." *Id.*

11. The FCC's conclusion that nondiscriminatory access applies to the actual act of placing a customer's listing information in a directory assistance database satisfies the spirit of the Act in the sense that another one of USWC's monopolistic advantages is eliminated and the telecommunications playing field is made more level. Indeed, as a result of the monopolistic history of the telecommunications industry, consumers are accustomed to having one phone book containing all telephone numbers. In Colorado, USWC's phone book, as published by Dex, dominates the market.

12. If CLECs were denied publication of directory listings in USWC's phone book on terms and conditions equal to those provided to USWC customers, at least two discriminatory effects could occur. First, USWC could simply deny publication to all CLEC's customers. This denial could become a critical marketing or sales tool that could be used to persuade a potential CLEC customer to choose USWC over a particular CLEC. Furthermore, under such a scenario, each CLEC would have to publish a separate directory for its particular customers. Accordingly, every telecommunications user would need to acquire a number of phone books equal to the number of telecommunications providers in order to obtain full coverage of all telecommunications users. This result would clearly discriminate against a CLEC in favor of USWC since consumers clearly would prefer to have all telephone numbers in one source. Second, if USWC did

---

rectory listings to be identical to 'subscriber list information,' as defined in section 222(f)(3) of the Act. The definition on section 222(f)(3) includes 'primary advertising classifications' under which businesses are listed in yellow pages directories. [footnote] These

classifications are not necessarily used in the provision of directory assistance. We therefore adopt these interpretations, and adopt revised new regulations incorporating these distinctions." *Id.*, ¶ 160.

not have a duty to publish directory listings on behalf of CLEC customers on equal terms and conditions, USWC would be free to charge CLEC customers higher publication rates. Thus, USWC would gain a competitive advantage as a result of its monopolistic history since most telecommunications consumer would prefer to be published in USWC's dominant telephone book.

13. In sum, this Court finds that an interpretation of nondiscriminatory access to directory listings that would allow USWC to perpetuate this aspect of its former monopoly by refusing to publish directory listings of CLEC customers on equal terms and conditions as USWC provides its own customers would discriminate against new entrants to the telecommunications market and therefore violate the Act. Nondiscriminatory access to directory listings under the Act extends to the actual act of placing a CLEC customer's listing information in the yellow pages, the white pages, and directories published in any other format on equal terms, rates and conditions as USWC provides to its customers.

14. The Court also rejects USWC's argument that the CPUC did not have the authority to bind Dex since Dex is a separate corporate entity apart from USWC and is the one that actually publishes the directories. USWC does not dispute the CLEC's assertion that Dex is an affiliate of USWC. FCC regulations mandate that nondiscriminatory access to directory listings must be provided by USWC with respect to directory listings that USWC or "an affiliate has published, caused to be published, or accepted for publication in any format." 47 C.F.R. § 51.5. The CPUC was entitled to rely on the FCC's interpretation of the Act in holding that USWC's obligations to ensure that listings for new entrants' customers are published in its directories extends to ensuring that listings for those customers are included in directories published by Dex.

15. This is supported by *Michigan Bell Telephone Co.*, wherein the United States District Court for the District of Minnesota held as follows:

> Ameritech further argues that it cannot be required to publish MCI's customers in its yellow pages because Ameritech does not publish a yellow pages directory. The Ameritech PagesPlus Yellow Pages, which lists Ameritech's business customers, are published by a separate company.... This argument is specious.... The FCC did not indicate that 'the act of placing a customer's listing' must be performed directly by the incumbent carrier itself. To the contrary, the regulations define 'directory listings' more broadly as any information 'that the telecommunications carrier or an affiliate has published, caused to be published, or accepted for publication in any directory format.' 47 C.F.R. § 51.5. Thus, the duty to publish competitors' business customers in a yellow pages directory on a nondiscriminatory basis extends to incumbent carriers who have caused their own customers listings to be published in a yellow pages directory.

*Id.* at 802.

16. Indeed, that court held that it is not even relevant whether the publishing entity is an "affiliate" because the FCC's regulation "is drafted more broadly." *Michigan Bell Telephone Co.*, 79 F.Supp.2d at 802. " 'Directory listings' include those that an incumbent carrier has caused those that an incumbent carrier has 'caused to be published' " citing 47 C.F.R. § 51.5. *Id.* "Ameritech causes its own customers to be published in the Ameritech PagesPlus Yellow Pages." *Id.* "Therefore, Ameritech has the duty to provide nondiscriminatory access to such yellow pages publication to [the CLECs'] customers." *Id.*

17. The Court declines to follow the cases cited by USWC from two district courts that held that a state commission lacked authority to impose directory listing requirements on Dex. *See MCI Telecomm.*

*Corp. v. U.S. West Communications. Inc.,* No. C97–1320R, 1998 U.S.Dist. LEXIS 21585 (W.D.Wash. July 21, 1998). *aff'd in part, rev'd in part on other grounds,* 204 F.3d 1262 (9th Cir. Mar.2, 2000); *US West Communications, Inc. v. Garvey,* No. 97–913 ADM/AJB, slip op. (D.Minn. Mar. 30, 1999); *US West Communications, Inc. v. Minnesota Pub. Utils. Comm'n,* 55 F.Supp.2d 968 (D.Minn.1999); *US West Communications, Inc. v. Garvey,* No. 97–CV–1963 ADM/AJB, slip op. (D.Minn. Mar. 30, 1999); *US West Communications, Inc. v. Garvey,* 55 F.Supp.2d 968 (D.Minn.1999). Those decisions were issued prior to the *Directories Order.*

18. In addition, one of those district courts failed to even address the binding FCC regulations requiring incumbents like USWC to provide nondiscriminatory access to directories published by the incumbents or their affiliates. *See MCI v. U.S. West,* 1998 U.S.Dist. LEXIS 21585, at *27. The other district court, instead of applying the FCC's binding rule extending an incumbent's nondiscrimination obligations to directory listings published by the incumbent or any of its affiliates, improperly applied the Act's access requirements only to affiliates "controlled" by the incumbent. *See U.S. West v. Garvey,* No. 97–913 ADM/AJB, slip op. at 40 n. 21; *US West v. Minnesota Pub. Utils. Comm'n,* 55 F.Supp.2d at 984; *US West v. Garvey,* No. 97–CV–1963 ADM/AJB, slip op. at 20 n. 7; *US West v. Garvey,* No. 98–1295 ADM/AJB, slip op. at 21 n. 10. Because those decisions do not address the pertinent section of the Act or the *Directories Order,* this Court does not find those decisions persuasive, and instead follows the *Michigan Bell* decision which addressed both § 251(b)(3) and the *Directories Order. See* 79 F.Supp.2d at 801–02.

19. Finally, with respect to USWC's challenge to its agreement with TCG, the Court concludes that the customer guide pages of the directory published by Dex for USWC are part of "a directory compilation for external use" and thus under the *Directories Order* they fall within USWC's obligation to provide nondiscriminatory access to "directory listing." In addition, those customer guide pages constitute "directory listings" within the meaning of 47 C.F.R. § 51.5, in that they are information published or caused to be published by USWC or its affiliate in a directory format. Accordingly, USWC is required under § 251(b)(3) of the Act to provide nondiscriminatory access to the customer guide section of the directory. The TCG Agreement, which incorporates the Commission's Arbitration Order (J.A. Vol. 10, Tab 87, at R. 6759), appropriately implements this statutory requirement by ensuring that TCG is afforded space in the customer guide pages on a nondiscriminatory basis, on the same terms and conditions as are provided to USWC.

20. Based on the foregoing, this Court finds that the challenged directory listings provisions comport with the Act and FCC regulations and that the COPUC had the authority to impose said provisions. Accordingly, the CPUC's imposition of the challenged directory listing provisions is AFFIRMED, and the Court DISMISSES Count Eight of USWC complaint in 97–D–152 and Count Seven of USWC's complaint in 97–D–2096.

### III. *CONCLUSION*

For the foregoing reasons, it is

ORDERED that Count One of the Complaints in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 is DISMISSED IN PART to the extent that this Count encompasses the issues of sham unbundling or the requirement that USWC provide already existing combinations to the CLECS. To the extent that Count One is based on a requirement that USWC provide combinations that do not already exist to the CLECS, this issue is DEFERRED until the hearing on April 20 and 21, 2000. It is

FURTHER ORDERED that the CPUC's imposition of the challenged direc-

tory listing provisions is AFFIRMED, and the Court DISMISSES Count Eight of USWC's complaint in 97–D–152 and Count Seven of USWC's complaint in 97–D–2096.