204 F.3d 1262 (9th Cir. 2000)
 MCI TELECOMMUNICATIONS CORPORATION, a Delaware corporation; MCI METRO ACCESS TRANSMISSION SERVICES, INC.,Plaintiffs-Appellants,
v.
U.S. WEST COMMUNICATIONS, a Colorado corporation; THE WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION(WUTC); ANNE LEVINSON, Chair; RICHARD HEMSTAD; WILLIAM P. GILLIS, in their official capacities as Commissioners of WUTC, Defendants-Appellees.
MCI TELECOMMUNICATIONS CORPORATION, a Delaware corporation; MCI METRO ACCESS TRANSMISSION SERVICES, INC., Plaintiffs,
v.
U.S. WEST COMMUNICATIONS, a Colorado corporation;Defendant-Appellant,
THE WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION (WUTC); ANNE LEVINSON, Chair;RICHARD HEMSTAD; WILLIAM P. GILLIS, in their official capacities as Commissioners of WUTC,Defendants-Appellees.
MCI TELECOMMUNICATIONS CORPORATION, a Delaware corporation; MCI METRO ACCESS TRANSMISSION SERVICES, INC.,Plaintiffs-Appellees,
v.
U.S. WEST COMMUNICATIONS, a Colorado corporation; ANNE LEVINSON, Chair;
RICHARD HEMSTAD; WILLLIAM P. GILLIS, in their official capacities as Commissioners of WUTC, OPINION Defendants,
and
THE WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION(WUTC), Defendant-Appellant.
 Nos. 98-35819, 98-35820 and 98-35822
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 7, 1999
Filed March 2, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: William Single, IV, MCI Telecommunications Corporation, Washington, D.C.; D. Scott Barash, Jenner & Block, Washington, D.C., for the plaintiffs-appellants-cross-appellees.
 Sherilyn Peterson and Kirstin S. Dodge, Perkins Coie, Bellevue, Washington; Shannon E. Smith, Assistant Attorney General, Olympia, Washington, for the defendants-appelleescross-appellants.
 Gary Feinerman, Mayer, Brown & Platt, Chicago, Illinois and Susan L. Pacholski, United States Department of Justice, Washington, D.C., for the amici curiae.
 Appeals from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief District Judge, Presiding. D.C. No. CV-97-01508-BJR, D.C. No. CV-97-01508-BJR, D.C. No. CV-97-01508-BJR
 Before: Alfred T. Goodwin, Mary M. Schroeder, and Susan P. Graber, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 INTRODUCTION AND STATUTORY BACKGROUND
 
 1
 This is an appeal by U S West Communications, Inc. ("U S West") and a cross-appeal by MCI Telecommunications Corporation ("MCI") from a district court judgment entered after review of a Washington Utilities and Transportation Commission ("WUTC") decision. The WUTC decision approved an agreement between U S West and MCImetro Access Transmission Services, Inc. ("MCImetro"), an MCI affiliate, under the Telecommunications Act of 1996 ("the Act"), codified in part at 47 U.S.C. SS 251-61. The agreement sets forth the terms under which MCImetro may interconnect with U S West, the former state regulated monopolist, in order to operate as a competing local telecommunications provider in the Seattle/Bellevue area.
 
 
 2
 The Act calls upon federal courts to hear challenges to interconnection agreements developed and approved through state administrative proceedings. Review in federal court is limited to the determination of whether the agreement "meets the requirements of" the Act. 47 U.S.C. S 252(e)(6). In this case, we are asked to decide whether a number of provisions in the agreement between U S West and MCImetro violate the Act.
 
 
 3
 This court has recently had occasion to decide several cases under the Telecommunications Act, and we then described the overall operation of the Act at greater length. See Pacific Bell v. Cook Telecom, Inc., 1999 WL 1249707 (9th Cir. Dec. 27, 1999); U S West Communications v. MFS Intelenet, Inc., 193 F.3d 1112 (9th Cir. 1999). One of the Act's principal ingredients is a regulatory framework for promoting competition in local telephone service. The Act prohibits state sanctioned monopolies, which previously governed the field. It contains various provisions aimed at facilitating entry by potential competitors. Ironically for a statute intended to promote competition, the Act creates two levels of regulatory control. The Federal Communications Commission is charged with the responsibility of promulgating regulations necessary to implement the Act itself, but the Act reserves to states the ability to impose additional requirements so long as the requirements are consistent with the Act and "further competition." See 47 U.S.C. S 251(d).
 
 
 4
 The Act labels all former local-phone service monopolists Incumbent Local Exchange Carriers ("ILECs"). In this case the ILEC is U S West. The new competitors are called Competing Local Exchange Carriers ("CLECs"). The CLEC in this case is MCImetro.
 
 
 5
 Section 251 of the Act imposes several direct requirements on an ILEC faced with potential competitive entry by a CLEC. It is of particular relevance to this appeal that ILECs must make key "network elements" available to CLECs on an "unbundled" basis at rates that are reasonable and nondiscriminatory. See 47 U.S.C. S 251(c)(3). The Act defines a "network element" as follows: "a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. S 153(29).
 
 
 6
 The FCC by regulation lists certain network elements that must be made available by the ILECs. See 47 C.F.R. S 51.319. In deciding which network elements are subject to unbundled access, Congress has instructed the FCC to consider "whether (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C.S 251(d)(2).
 
 
 7
 The Act does not, however, attempt to provide all the terms upon which ILECs must transact with CLECs. Rather, section 252 of the Act permits carriers to contract independently for interconnection and the provision of goods and services. The reward for reaching an independent agreement is exemption from the substantive requirements of subsections 251(b) and 251(c). See 47 U.S.C. S 252(a)(1). If the carriers do not reach an independent agreement within a specified period, the parties may petition the state agency responsible for regulating local telecommunications to arbitrate the open issues. If arbitration comes into play, then the resulting agreement must comply with section 251 of the Act and any FCC regulations promulgated under that section. See 47 U.S.C. S 252(c)(1). All interconnection agreements, whether reached independently or through arbitration, must be approved by the state agency (in this case, the WUTC). See 47 U.S.C. S 252(e)(1). The state agency may refuse to approve an independently negotiated agreement only if (1) the agreement or a provision thereof discriminates against a carrier not a party to the agreement, or (2) the agency finds that implementing the agreement or a provision thereof would be inconsistent with the public interest, convenience, and necessity. See 47 U.S.C. S 252(e)(2)(A). The state agency may refuse to approve an arbitrated agreement only if the agreement or a provision thereof fails to meet the requirements of section 251 of the Act or the FCC regulations promulgated under the Act. See 47 U.S.C. S 252(e)(2)(B).
 
 
 8
 Finally, the Act permits any party "aggrieved " by a determination made by a state agency under section 252 to "bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and this section." 47 U.S.C.S 252(e)(6). This language makes clear that review in federal court is restricted to the determination of whether the terms of the agreement violate any of the Act's requirements. This limited task is not always an easy one, however. "It would be a gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." AT&T v. Iowa Utils. Bd., 119 S. Ct. 721, 738 (1999).
 
 
 9
 We have jurisdiction of appeals from final judgments in these actions under 28 U.S.C. S 1291. Our review is de novo. See MFS Intelenet, 193 F.3d at 1117. To the extent that the statute requires factual findings to support the state agency's determination, those findings are reviewed for substantial evidence. GTE South, Inc. v. Morrison, 199 F.3d 733, 745-46 (4th Cir. Dec. 15, 1999)
 
 
 10
 HISTORY OF THIS AGREEMENT AND THE EIGHTH CIRCUIT LITIGATION
 
 
 11
 The FCC promulgated its initial regulations under the Act in 1996. Under the Hobbs Act, the Federal Courts of Appeals have exclusive jurisdiction over challenges to FCC regulations. See 28 U.S.C. S 2342; 47 U.S.C.S 402(a). Several parties filed petitions for review of the FCC regulations in several different circuits. When agency regulations are challenged in more than one court of appeals, 28 U.S.C.S 2112 requires that the panel on multidistrict litigation consolidate the petitions and assign them to a single circuit. The panel assigned the challenges to the FCC regulations to the Eighth Circuit, which thereby became, and remains, "the sole forum for addressing . . . the validity of the FCC's rules." GTE South, 199 F.3d at 743 Therefore, the subsequent history of the Eighth Circuit litigation, Iowa Utilities Board v. FCC, has punctuated the history of this agreement and litigation.
 
 
 12
 On March 26, 1996, MCImetro requested interconnection negotiations with U S West. On August 30, when the parties could not come to agreement on a number of issues, MCImetro petitioned for arbitration before a WUTC arbitrator.
 
 
 13
 On October 15, 1996, approximately a month before the WUTC arbitrator was to hold a hearing on the interconnection agreement between MCImetro and US West, the Eighth Circuit stayed the effectiveness of several FCC rules on the ground that the FCC may have not had jurisdiction to issue them. Thus, when the WUTC arbitrator held the hearing in late November and issued his report in December of 1996, some of the rules had been stayed, but no decision on the merits had been issued. On July 18, 1997, after the parties in this case had completed the arbitration and mediation process, the Eighth Circuit issued a decision on the merits. See Iowa Utils. Bd. v. FCC, 120 F.3d 1753 (8th Cir. 1997). The Eighth Circuit vacated all of the rules that it had previously stayed, along with several others. On that very day, MCImetro and U S West filed with the WUTC their final statements of position as to the remaining terms in dispute.
 
 
 14
 Because a state agency has only 30 days to approve an arbitrated agreement, the WUTC entered its order approving the agreement between MCImetro and U S West and modifying the arbitrator's recommendations in some respects on August 18, 1997. The WUTC said it had not had sufficient time to consider the Eighth Circuit's decision and therefore did not address its effect on the agreement.
 
 
 15
 In September 1997, U S West and MCImetro each filed suit in the Western District of Washington seeking review of WUTC's approval and modification of the agreement. The district court issued its decision on July 22, 1998, while the Eighth Circuit's decision in Iowa Utilities Board was still in effect. Relying on that decision, the district court struck some provisions from the agreement, reasoning that as a result of the Eighth Circuit's rulings the provisions no longer met the requirements of the Act.
 
 
 16
 Both parties promptly appealed the district court's decision to this court. While this appeal was being briefed, the Supreme Court granted certiorari in Iowa Utilities Board and handed down its decision. See AT&T v. Iowa Utils. Bd. The Supreme Court reversed the Eighth Circuit in many respects, and reinstated all but one of the previously vacated regulations. We asked for supplemental briefing on the Supreme Court's decision.
 
 
 17
 We now turn to the substance of the appeal.
 
 
 18
 PROVISION PROHIBITING U S WEST FROM SEPARATING ALREADY COMBINED NETWORK ELEMENTS
 
 
 19
 As approved by the WUTC, the agreement contained a provision requiringU S West to refrain from separating already combined network elements before providing them to MCImetro. FCC Rule 315(b) was in effect when the agreement was arbitrated and mandated such a provision. The Eighth Circuit's Iowa Utilities Board decision invalidated Rule 315(b), concluding that it was inconsistent with the meaning of the Act. See Iowa Utils. Bd., 120 F.3d at 813. The district court in this case held that under the Eighth Circuit's reasoning, the presence of the provision in the agreement could no longer be said to meet the requirements of the Act. The district court accordingly struck the provision from the agreement. The Supreme Court has since reversed the Eighth Circuit and reinstated Rule 315(b). See Iowa Utils. Bd., 119 S. Ct. at 737. We must therefore reverse the district court and order the provision restored to the agreement.
 
 
 20
 COMBINING SEPARATE NETWORK ELEMENTS AT MCIMETRO'S REQUEST
 
 
 21
 In addition to requiring that U S West refrain from separating already combined network elements, the agreement requires U S West to combine otherwise separate elements upon MCImetro's request. This provision was mandated by FCC Rules 315(c)-(f) at the time of arbitration. The Eighth Circuit invalidated Rules 315(c)-(f) using the same rationale it employed to invalidate Rule 315(b). That is, the Eighth Circuit concluded that requiring combination was inconsistent with the meaning of the Act because the Act calls for "unbundled" access. See Iowa Utils. Bd. , 120 F.3d at 813. The district court once again followed the Eighth Circuit's reasoning and struck the combination provision from the agreement.
 
 
 22
 Unlike its decision with regard to Rule 315(b), however, the Eighth Circuit's decision with regard to Rules 315(c)-(f) was not before the Supreme Court. The Court's holding concerning Rule 315(b), however, confirms that the Eighth Circuit's interpretation of the Act was incorrect. The Court firmly stated that the Act's mention of "unbundled access" does not even "remotely imply" that elements must be provided only in uncombined form and never in combined form. Iowa Utils. Bd., 119 S. Ct. at 737. The Eighth Circuit's decision to vacate the FCC regulation certainly still stands, and is immune under the Hobbs Act from collateral attack. See 28 U.S.C. S 2342; MFS Intelenet , 193 F.3d at 1120. All this means for the purposes of the present appeal is that the Act does not currently mandate a provision requiring combination. Our task is to determine whether such a provision "meets the requirements" of the Act, i.e., to decide whether a provision requiring combination violates the Act. The Supreme Court's interpretation of the Act makes absolutely clear that it does not, and we have already so held. See MFS Intelenet, 193 F.3d at 1121. The district court's invalidation of this provision must be reversed as well so that the original provision is restored to the agreement.
 
 DARK FIBER
 
 23
 The agreement contains a provision requiring U S West to provide MCImetro with dark fiber on an unbundled basis. Dark fiber is fiber optic cable laid in the ground but not yet activated for use. The FCC's original "network elements" rule did not mandate unbundled access to dark fiber, but the district court held that an interconnection agreement provision requiring such access did not violate the Act. The district court's conclusion has since been solidified by the FCC's new rule, which treats dark fiber as a network element and therefore mandates U S West to provide competitors with access to it. See 47 C.F.R. S 51.319(a)(1). Because unbundled access to dark fiber is now not only consistent with the Act but affirmatively required by it, we affirm the district court on this issue.
 
 CO-LOCATION OF REMOTE SWITCHING UNITS
 
 24
 U S West also challenges a provision of the agreement requiring U S West to allow MCImetro to co-locate remote switching units ("RSUs"). "Co-location" refers to an ILEC's obligation under the statute to permit CLECs to install equipment on the ILEC's property in order to connect to the ILEC's existing network. Section 251(c)(6) of the Act imposes upon ILECs a duty to provide for "physical colocation of equipment necessary for interconnection or access to unbundled network elements on the premises of the local exchange carrier." The WUTC employed the FCC's definition of "necessary" as anything "useful" for interconnection, and concluded that RSUs fit the bill. The WUTC therefore added a provision to the agreement requiring U S West to permit colocation of RSUs. The district court held that the provision did not violate the Act and refused to strike it from the agreement.
 
 
 25
 U S West argues that we must strike the provision because the WUTC relied on the FCC's interpretation of the word "necessary," an interpretation with which the Supreme Court has found fault. See Iowa Utils. Bd., 119 S. Ct. at 735. Were we reviewing this agreement under the judicial review standards of the Administrative Procedure Act, 5 U.S.C. SS 701 et seq., we might agree with U S West that the agency's use of an improper definition of "necessary " requires us to return the agreement to the agency for reconsideration. The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. S 706.
 
 
 26
 We are not reviewing the actions of a federal agency subject to the APA, however. Here, our task is not to examine possible flaws in the WUTC's decision-making process, but to decide whether a provision resulting from that process--the provision requiring co-location--has resulted in an agreement that fails to "meet the requirements" of the Telecommunications Act. 47 U.S.C. S 252(e)(6). Although the Act may not require the provision, it certainly does not proscribe it. Sections 251 and 252 of the Act are designed to provide some flexibility in fixing the provisions of interconnection agreements. Hence, we conclude that the provision is valid and affirm the district court.
 
 SHARED TRANSPORT
 
 27
 Shared transport refers to cable that connects facilities owned by different parties. The agreement did not require U S West to provide MCImetro with unbundled access to shared transport, despite an FCC rule mandating such access. Relying on the FCC rule, the district court held that because the agreement failed to include a provision requiring unbundled access to shared transport, the agreement in that respect failed to meet the requirements of the Act.
 
 
 28
 Subsequent to the district court's decision, the Supreme Court vacated the rule in question. The Court held that in promulgating the rule, the FCC had construed too permissively the congressional requirement that elements should only be subject to unbundled access if "necessary" and if lack of access to them would "impair" a competing carrier from providing services. See 119 S. Ct. at 736.
 
 
 29
 The FCC has now promulgated a new network elements rule, this time taking into account the Supreme Court's directives in Iowa Utils. Bd. Once again, the regulations require unbundled access to shared transport, though under limited circumstances. See 47 C.F.R. S 51.319(d)(1)(C). Apparently, shared transport is now required only when ILECs are also providing local circuit switching. See In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Third Report and Order, FCC 99-238 (Nov. 5, 1999) at P 369 ("[W]here an incumbent LEC provides requesting carriers with access to unbundled switching, we require incumbent LECs also to provideaccess to unbundled shared transport services.").
 
 
 30
 Because the present rule is narrower than the rule relied upon by the district court, we reverse the district court's decision. We remand so that the district court may consider whether to order a new provision or direct the parties to return to the WUTC in light of the special local considerations that may be relevant.
 
 BILL AND KEEP
 
 31
 The Telecommunications Act requires that interconnecting ILECs and CLECs compensate each other for the cost of one party's transport and termination of traffic originating on the other party's network. See 47 U.S.C.S 251(b)(5). Before the WUTC arbitrator, MCImetro proposed and U S West opposed a method known as "bill and keep, " a sort of rough justice approach under which the parties simply assume that for every U S West customer for whom MCImetro must pay transport and termination costs there will be an MCImetro customer for whom U S West must do likewise. The parties therefore just bill their own customers for traffic on their own networks and keep all of that revenue rather than making regular and presumably roughly equal exchanges of transport and termination costs. The arbitrator heard evidence from both sides, and decided to adopt the MCImetro bill and keep proposal, a decision that the WUTC approved and the district court upheld as consistent with the Act.
 
 
 32
 Section 251(b)(5) of the Act imposes upon ILECs a duty to establish reciprocal compensation arrangements, and section 252(d)(2)(A) provides that state agencies cannot find a reciprocal compensation arrangement "just and reasonable" under the Act unless it provides for "the mutual and reciprocal recovery by each carrier" of transport and termination costs and "determines such costs on the basis of a reasonable approximation of the additional costs of terminating such calls." Section 252(d)(2)(B) states, however, that the Act "shall not be construed . . . to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery such as bill-and-keep arrangements. " (Parentheses omitted.) The Act therefore does not preclude arrangements such as the one contained in the agreement between U S West and MCImetro.
 
 
 33
 U S West argues, however, that it presented sufficient evidence in this case to demonstrate that its cost of transporting and terminating MCImetro calls so exceed MCImetro's costs so that bill and keep is neither just nor reasonable in these circumstances and therefore violates the Act. U S West assigns error to the arbitrator's use of a presumption that calls between carriers will be in balance, arguing that the presumption is contained in one of the FCC rules the Eighth Circuit stayed before it ruled on the merits in Iowa Utilities Board and was therefore technically not in effect at the time the arbitrator made his decision. The rule (since reinstated by the Supreme Court) simply provides that "[n]othing in this section precludes a state commission from presuming " that traffic is in balance. 47 C.F.R. S 51.713(c). It does not require the presumption, but rather clarifies that such a presumption is not foreclosed by the FCC's own regulations.
 
 
 34
 As the arbitrator explained, the WUTC has a general policy favoring bill and keep arrangements. Because we are dealing with a new competitive relationship, the evidence on actual costs contained in the record consists only of speculation on the part of U S West and the statement from a WUTC official, reasonable at least on its face, that costs will be equal even if traffic volume is out of balance as long as individual customers make about as many calls as they receive. Given the impossibility of more concrete data, and Congress's generally permissive attitude toward bill and keep arrangements as expressed in the Act, the arbitrator's decision to impose the system does not violate the Act as a matterof law and is sufficiently supported by substantial evidence.
 
 UP FRONT CONSTRUCTION CHARGES
 
 35
 The agreement requires U S West to undertake construction if necessary to meet MCImetro's interconnection requests. U S West does not contest the substance of this provision, but argues that the fact that the agreement does not require MCImetro to pay its construction charges up front rather than after construction is completed violates the Act. The district court rejected this argument and upheld this provision of the agreement.
 
 
 36
 U S West's sole argument rests on the Eighth Circuit's decision to vacate an FCC rule requiring an ILEC to provide CLECs with interconnection at levels of quality superior to those at which the ILEC provides the same services to itself. See Iowa Utils. Bd., 120 F.3d at 812. The Eighth Circuit held that the Act merely requires equal quality. Id. This holding about quality of service is not relevant to the question of when construction costs are to be paid. U S West cannot point to any provision of the Act or FCC regulations that states or even implies that construction costs must be paid up front. We therefore affirm the district court's decision to uphold the agreement's construction provision as approved by the WUTC.
 
 OBJECTIVE PERFORMANCE STANDARDS
 
 37
 The agreement currently requires U S West to provide services to MCImetro as quickly as U S West provides them to itself. MCI wants the agreement to contain "objective performance standards," or, in other words, hard numbers on these time limits. MCI wants the agreement to state in exactly how many days U S West must provide a particular service. MCI suggests that the WUTC was required to include objective performance standards by an FCC rule to that effect.
 
 
 38
 MCI actually is referring to language in the FCC's First Report and Order, which is not itself an FCC "rule." The Order explains why the FCC chose to promulgate the rules it did, and why it accepted the arguments of some commenters and rejected those of others. With regard to the issue of nondiscriminatory access to unbundled network elements and just, reasonable and nondiscriminatory terms and conditions for the provision of unbundled network elements, the Order focused on two questions: (1) should the FCC promulgate any national rules at all, and (2) if so, what should those rules be?
 
 
 39
 In a section titled "Comments," the FCC put forth the positions of the various commenters on these two issues. Regarding the second issue, the Order mentions that during the notice and comment period MCI argued that the FCC "should adopt specific standards, including time limits, for implementation of requests for unbundled elements." In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, First Report and Order, FCC 96-325 (Aug. 8, 1996) at P 300. ("First Report and Order"). The Order goes on to state that a "number of incumbents, including Bell Atlantic, SBC, GVNW, and NYNEX, contend that we should not set specific rules, including time limits, for installation, service, maintenance and repair because incumbent LECs have different operational and administrative systems, and are subject to different state standards." Id. at P 301.
 
 
 40
 In a section titled "Discussion," the FCC explained that it had decided to reject the suggestion to promulgate no national rules at all. Instead, the FCC adopted "general, national rules defining `nondiscriminatory access' to unbundled network elements, and `just, reasonable, and nondiscriminatory' terms and conditions for the provision of such elements. " First Report and Order at P 308. The FCC indicated that the general rules would "rely" on the states to develop more specific ones "in arbitrations and other state proceedings" because states were better situated to do so. Id. at P 310. The FCC further stated: "We expect that the states will implement the general nondiscrimination rules set forth herein by adopting, inter alia, specific rules determining the timing in which incumbent LECs must provision certain elements . . . ." Id.
 
 
 41
 This language in the Order demonstrates that the FCC hoped (or "expected") that the states would adopt specific rules. Neither the Act nor any FCC rule affirmatively requires states to do so, however. The FCC might have wanted the WUTC to impose more specific requirements, such as objective performance standards, on an incumbent like U S West, but again, our review seeks to determine solely whether the lack of those requirements violates the Act. In the absence of an FCC rule, the law does not require them.
 
 CONCLUSION
 
 42
 We affirm the district court's decision with respect to the following: (1) the validity of the provision requiring unbundled access to dark fiber, (2) the validity of the provision requiring co-location of RSUs, (3) the validity of the provision imposing the bill and keep method of reciprocal compensation, (4) the refusal to add to the agreement a provision requiring MCImetro to pay its construction charges up front, and (5) the validity of the agreement's failure to include "objective" performance standards.
 
 
 43
 We reverse the district court's decision with respect to the following: (1) the validity of the provision prohibiting U S West from separating already-combined network elements, (2) the validity of the provision requiring U S West to combine network elements at MCImetro's request, and (3) the addition of a provision requiring unbundled access to shared transport.
 
 
 44
 The overall result is that the original agreement between U S West and MCImetro has been restored in all respects with the possible exception of shared transport. We remand the issue of shared transport for further consideration.
 
 
 45
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 Each party should bear its own costs