**MCI TELECOMMUNICATIONS CORPORATION, et al.,**
**Plaintiffs,**

v.

**BELLSOUTH TELECOM-**
**MUNICATIONS, INC.,**
**et al., Defendants.**

**No. 4:97CV141–RH.**

United States District Court,
N.D. Florida,
Tallahassee Division.

June 6, 2000.

---

Donald B Verrilli, Donald B Verrilli Jr, PA, Washington, DC, Richard Dent Melson, Hoppig Green Sams & Smith, Tallahassee, FL, Carolyn Songer Raepple, Hopping Green Sams & Smith PA, Tallahassee, FL, for plaintiffs.

Jon W Zeder, Adorno & Zeder, PA, Miami, FL, William Wallace Deem, Mahoney Adams & Criser, Jacksonville, FL, Sean A Lev, Kellogg Huber Hansen, Washington, DC, Michael Kellogg, Kellogg Huber Hansen, Washington, DC, David E Smith, Public Service Commission, State of Florida, Tallahassee, FL, for defendants.

## ORDER ON MERITS

HINKLE, District Judge.

This action is a challenge under the Telecommunications Act of 1996, 47 U.S.C. §§ 251–52, to a decision of the Florida Public Service Commission with respect to the terms and conditions under which the defendant incumbent local exchange carrier must make facilities and network elements available to the plaintiff competitors. I rule in favor of the plaintiff competitors and against the defendant incumbent local exchange carrier on each of the four contested issues. I direct the defendant Commissioners of the Florida Public Service Commission to take appropriate action to implement this decision.[1]

---

1. The plaintiffs are MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc., related entities that will be collectively referred to in this order as "MCI." Defendants are BellSouth Telecommunications, Inc. ("BellSouth"); each of the five commissioners of the Florida Public Service Commission in his or her official capaci-

### Background—The Statutory Framework

Historically, local telephone service was provided in the United States on a monopoly basis by carriers regulated under state law by state public service commissions. Congress fundamentally changed that approach by enacting the Telecommunications Act of 1996. The Act imposes on local carriers, as a matter of federal law, various duties designed to foster competition. The Act allows state commissions the option of taking a major role in implementing the Act's requirements.[2]

The federal duties imposed on each "incumbent local exchange carrier"—that is, on each carrier who previously provided local service on a monopoly basis—include these. First, incumbents must offer their services for resale at wholesale rates, must not prohibit or unreasonably limit resale, must provide number portability and dialing parity to competitive carriers, must afford competitive carriers access to existing rights-of-way, and must establish reciprocal compensation arrangements for transport and termination of calls handled by more than one carrier. *See* 47 U.S.C. §§ 251(b) & 251(c)(4).[3] More fundamentally, each incumbent must allow any other carrier to interconnect with its facilities and equipment on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2). Finally, each incumbent must provide to any requesting carrier nondiscriminatory access to "network elements" on an unbundled basis, again on "rates, terms and conditions that are just, reasonable, and nondiscriminatory," 47 U.S.C. § 251(c)(3), at least when access to such network elements is "necessary" (in the case of proprietary network elements) or when failure to provide such access would "impair" the requesting carrier's ability to provide services (in the case of non-proprietary network elements). *See* 47 U.S.C. § 251(d)(2). "Network elements" are broadly defined by the act to include any "facility or equipment used in the provision of a telecommunications service" as well as features, functions, and capabilities that are provided by means of any such facility or equipment. 47 U.S.C. § 153(29).

The Act also imposes on each incumbent the duty to negotiate in good faith with any requesting carrier on the terms and conditions of an agreement under which these various duties will be fulfilled. *See* 47 U.S.C. § 251(c)(1). The Act likewise imposes on requesting carriers the duty to negotiate in good faith. *Id.*

If the parties reach a negotiated agreement, it must be submitted to the state commission for approval. 47 U.S.C. § 252(e)(1). If the parties fail to agree on all terms and conditions, any party to the negotiation may request binding arbitration before the state commission of "any open issues." 47 U.S.C. § 252(b)(1). If the state commission chooses not to act on either a negotiated agreement or request for arbitration, the Federal Communications Commission must assume the responsibilities of the state commission. 47 U.S.C. § 252(e)(5).

---

ty; and the Florida Public Service Commission itself.

**2.** Local telephone service is inextricably intertwined with the interstate (indeed, international) communications system. Congress clearly has authority under the Commerce Clause to act in this area. Because the Telecommunications Act does not *require* state commissions to participate in its regulatory scheme, the Act does not contravene the principle of *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding that Congress cannot require state law enforcement officers to perform background checks mandated by federal firearms statute). Nothing in the United States Constitution prevents the federal and state governments from taking cooperative action, nor does the Constitution prevent Congress from allowing state administrative agencies to participate in a federal regulatory scheme if they so choose.

**3.** The Act imposes some of these duties on all local exchange carriers, not just incumbents. See 47 U.S.C. § 251(b).

If a state commission chooses to act on either a negotiated agreement or request for arbitration, the Act provides for judicial review of the commission's decisions in federal district court. *See* 47 U.S.C. § 252(e)(6). The case at bar is an action for judicial review under this provision.[4]

### Background—The Case at Bar

Defendant BellSouth is the incumbent local exchange carrier in parts of the state of Florida. Plaintiff MCI is a prospective competitor. In accordance with the Telecommunications Act, BellSouth and MCI entered negotiations for an agreement under which MCI would interconnect with BellSouth's facilities and have access to BellSouth's network elements. They were unable to agree on all terms and conditions of an agreement and thus sought and obtained arbitration before the Florida Public Service Commission. Following an evidentiary hearing, the Florida Commission issued a final arbitration order and, on motions of each side for reconsideration, an amended final order. MCI now brings this action challenging the Florida Commission's decision in certain respects, and BellSouth counterclaims challenging the decision in another respect.

Specifically, MCI challenges the pricing methodology employed by the Florida Commission to set the rates for network elements and non-recurring charges; the Florida Commission's exclusion of "dark fiber"—fiber optic cable that is in place but not in active use—from the group of network elements that must be provided by BellSouth; and the Florida Commission's failure to require a compensation mechanism (in the nature of a liquidated damages provision) as part of the agreement. In its counterclaim, BellSouth challenges the Florida Commission's treatment of "recombining" unbundled network elements for sale as complete service. This order addresses these four issues in turn.[5]

The parties have agreed that this court's review should be conducted based solely on the record as compiled in the Florida Commission. The parties have submitted briefs and presented oral argument, and more recently have submitted supplemental briefs addressing the decision of the United States Supreme Court in *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). This order constitutes the court's ruling on the merits.

I conclude that (1) the Florida Commission's pricing methodology for net-

**4.** Such an action for judicial review of a state commission's decision may proceed against the individual commissioners in their official capacities in accordance with *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and thus is not barred by the Eleventh Amendment. *See MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 1997 WL 1133453 (N.D.Fla.1997) (order denying motion to dismiss in case at bar). Although the Florida Public Service Commission as an entity also is a named defendant in this action, *see* footnote 1 supra, it did not move for dismissal of the claims against the entity, apparently choosing to stand together with its commissioners so long as they remained in the case. I understand the Florida Commission's position to be that the case should be dismissed under the Eleventh Amendment against both the entity and the commissioners, but that, if the action is not going to be dismissed against the commissioners (as I have ruled), then the entity does not seek separate dismissal of the case as

against the entity. This allows the Florida Commission to submit pleadings in its own name and otherwise is of no practical significance. Because the Florida Commission has not sought separate dismissal of the case as against the entity, I have not addressed the issue of whether, by voluntarily participating in proceedings implementing the Telecommunications Act of 1996, the Florida Commission waived its Eleventh Amendment immunity from actions such as the case at bar.

**5.** MCI initially also challenged the Florida Commission's failure to adopt geographically deaveraged rates for network elements reflecting differences in the cost of providing network elements in different locations in the state of Florida. MCI has withdrawn this claim, however, on the grounds of a stipulation entered before the Florida Commission for deaveraged interim rates pending determination by the Florida Commission of permanent deaveraged rates.

work elements and non-recurring charges is invalid because it is inconsistent with governing FCC regulations, and the Florida Commission thus must reconsider its pricing decisions; (2) the Florida Commission incorrectly concluded that "dark fiber" is not a "network element" within the meaning of the Act, and the Florida Commission therefore must reconsider its decision not to require BellSouth to provide MCI access to dark fiber; (3) the Florida Commission has authority to, and must, arbitrate the issue of whether the parties' interconnection agreement should include a compensation mechanism; and (4) BellSouth's counterclaim challenging the Florida Commission's treatment of the issue of "recombining" unbundled network elements is unfounded.

### Standard of Review

The Telecommunications Act provides for actions such as the case at bar in a single sentence:

> In any case in which a State commission makes a determination under [the Act], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of [the Act].

47 U.S.C. § 252(e)(6).[6] The Act does not further specify the standard of review to be applied in determining "whether the agreement ... meets the requirements of" the Act.

■ I conclude that district court review of the meaning and import of the Telecommunications Act should be *de novo* and that, when acting in conformance with a correct interpretation of the Act, state commissions have broad discretion reviewable only under the arbitrary and capricious standard. I base this conclusion on the statutory language, the standards generally applicable to judicial review of administrative action, the apparent purpose

of involving state commissions in this process while providing for federal district court review of their decisions, and the emerging case law under the Act. I address each of these considerations in turn, beginning with the statutory language.

The statute provides for an action in federal district court "to determine whether the agreement ... meets the requirements of" the Act. 47 U.S.C. § 252(e)(6). Although this language does not explicitly set forth a standard of review, it provides guidance in two ways. First, the statute assigns to the district court the job of determining whether the agreement as approved or mandated by the state commission meets the requirements of the Act, and in doing so the statute suggests not at all that any deference is due the state commission. Second, the statutory language makes no reference to any district court review of the state commission's action other than for compliance with the Act. Although some level of review of state commission action may be necessary to render meaningful the district court's review for compliance with the Act's legal requirements, the omission of any provision for review for any other purpose suggests that, within the bounds of the Act's legal requirements, review should be deferential.

This standard of review is generally consistent with the standards applicable to judicial review of administrative action in other settings. Courts generally review agency factual determinations under a deferential standard such as whether the agency decision is supported by substantial evidence. *See, e.g.,* 5 U.S.C. § 706(2)(E). Courts generally review an agency's policy determinations or actions implementing established legal standards under a deferential standard such as whether the action is arbitrary and capricious or an abuse of discretion. *See, e.g.,* 5

---

**6.** The "agreement" to which this provision applies is an interconnection agreement of the type here at issue. The "statement" to which this provision applies is a statement of a Bell operating company of generally available terms under 47 U.S.C. § 252(f). No such statement is involved here.

U.S.C. § 706(2)(A). And although judicial review of a federal agency's interpretation of a federal statute it is charged with administering is also deferential, federal courts generally do not similarly defer to interpretations of federal law by *state* agencies. *Compare Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (requiring court to give "controlling weight" to federal agency legislative regulations "unless they are arbitrary, capricious, or manifestly contrary to the statute") *with Amisub (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789, 795–96 (10th Cir.1989) (holding "state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency"); *Turner v. Perales,* 869 F.2d 140, 141 (2d Cir.1989) (declining to apply *Chevron* deference to state agency decision where federal scheme "does not envision any unitary or uniform application from state to state"); *and Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312, 316 (9th Cir.1988) (finding deference to state agency inappropriate due to the state's inexperience implementing federal laws, the absence of continuous congressional supervision and the lack of delegated authority under the federal statute at issue). Accordingly, reading § 252(e)(6) to require *de novo* review of a state commission's interpretation of the Act, but otherwise to require deference to the state commission, is generally consistent with the backdrop of precedent against which Congress acted. *Cf. United States v. Jordan,* 915 F.2d 622, 628 (11th Cir.1990) ("Under accepted rules of statutory construction, it is generally presumed that Congress, in drafting legislation, is aware of well-established judicial construction of other pertinent existing statutes").

This approach makes sense, both as an original matter and based on the apparent purpose of Congress's decision (1) to involve the state commissions in this process but (2) to provide for federal district court review of their determinations. Congress of course could have provided for judicial resolution of disputes in the first instance, or could have provided for initial resolution of disputes by an administrative law judge, or could have provided for arbitration before a private arbitrator or arbitration panel chosen by the parties or designated in various other ways. Congress chose instead to have disputes resolved initially by the appropriate state commission (if it agreed to participate in the process), and Congress undoubtedly did so in recognition of the state commission's considerable expertise in the telecommunications field generally and in the state at issue in particular. It would make no sense to adopt a standard of review that did not recognize that expertise. At the same time, however, Congress chose not to leave the matter solely to the state commission but to have a federal district court determine "whether the agreement . . . meets the requirements of" the Telecommunications Act. State commissions have no special expertise in interpreting federal statutes and no authority to make federal law. Federal courts are or should be at least as adept as state commissions in interpreting federal statutes. There is thus far less reason for deference to state commissions on issues of the meaning and import of the Act, and it makes sense for district courts to address such issues *de novo,* as Congress apparently intended.

In sum, I will review *de novo* issues regarding the meaning and import of the Telecommunications Act and will review the Florida Commission's determinations of how to implement the Act as so construed only under the arbitrary and capricious standard. This accords with the consistent approach of courts that have addressed this issue under the Act. *See, e.g., MCI Telecommunications Corp. v. Michigan Bell Telephone Co.,* 79 F.Supp.2d 768, 773 (E.D.Mich.1999); *Bell Atlantic–Delaware, Inc. v. Global Naps South, Inc.,* 77 F.Supp.2d 492, 502 (D.Del. 1999); *Bellsouth Telecommunications, Inc. v. ITC Deltacom Communications,*

*Inc.,* 62 F.Supp.2d 1302, 1307 (M.D.Ala. 1999); *U.S. West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997).[7]

### *Merits*

## I. *PRICING METHODOLOGY*

■ The Telecommunications Act directs state commissions to set "just and reasonable" prices for interconnection and network elements "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element." 47 U.S.C. § 252(d)(1). All parties to this action apparently agree that this means prices must be based on cost that reasonably would be incurred to provide the service or network element at issue prospectively, not cost that may have been incurred historically but would not reasonably be incurred to provide the service or network element prospectively. As the parties have said, prices must be based on "forward-looking," not historical, cost.

The parties disagree, however, on the proper method of calculating "forward-looking" cost. MCI advocates the use of Total Element Long–Run Incremental Cost ("TELRIC"), a methodology adopted by regulations of the Federal Communications Commission ("FCC"). *See* 47 C.F.R. §§ 51.505, 51.511. The FCC regulations were stayed before they took effect and eventually were invalidated by a controlling decision of the United States Court of

Appeals for the Eighth Circuit on the grounds they were beyond the FCC's jurisdiction.[8] Because of the Eighth Circuit's stay, the Florida Commission addressed the matter independently, without regard to the FCC regulations. The Florida Commission adopted a different methodology known as Total Service Long–Run Incremental Cost ("TSLRIC").

The essential difference between the FCC's "TELRIC" method and the Florida Commission's "TSLRIC" method lies in their treatment of the existing network structure of the incumbent local exchange carrier at issue. While the Florida Commission's version of TSLRIC uses the *current network architecture* and future replacement technology as the basis for determining long-run incremental cost, TELRIC assumes only that the existing wire centers are in place and then builds a *hypothetical, efficient network* around them. *See* 47 C.F.R. §§ 51.503, 51.505.

Nothing in the Telecommunications Act specifies which of these two methodologies must be followed. Reasonable arguments can be made either way. Congress has not definitively resolved the issue. This is, therefore, an issue on which the appropriate administrative agency's adoption of either methodology would survive judicial review under the applicable arbitrary and capricious standard.

**7.** I have not overlooked that the Act refers to state commission proceedings as "arbitration" and that decisions of arbitrators are ordinarily reviewed under an even more deferential standard, even with respect to issues of law. *See, e.g., Marshall & Co., Inc., v. Duke,* 114 F.3d 188, 190 (11th Cir.1997); *Excel Corp. v. United Food and Commercial Workers Int'l Union, Local 431,* 102 F.3d 1464, 1467 (8th Cir.1996). I conclude, however, that the reference to state commission proceedings as "arbitration" is intended to recognize that Congress did not—and indeed perhaps could not—require state commissions to participate in the process at all. *See Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). Thus, like arbitrators and unlike administrative agencies under more typical circumstances,

state commissions participate in this process only voluntarily. Absent any accepted term for the process by which a state agency voluntarily participates in implementing a federal statute in this manner, Congress used the term "arbitration." There is no reason to believe that this was intended to affect the standard of review in district court, and, for the reasons set forth in the text, I conclude that the appropriate standard derives from that ordinarily applicable to judicial review of administrative decisions, not arbitration decisions.

**8.** *See Iowa Utilities Bd. v. Bell Atlantic Corp.,* 120 F.3d 753, 800 (8th Cir.1997), *rev'd in relevant part,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

The dispositive issue now before the court, therefore, is which agency's view— the FCC's or the Florida Commission's— will prevail. As noted above, when the Florida Commission acted, the United States Court of Appeals for the Eighth Circuit had stayed the FCC's regulations; that court eventually held that the FCC had no jurisdiction to adopt pricing rules governing local (as opposed to interstate) telephone service. Had that decision remained intact, the Florida Commission's adoption of TSLRIC would have been unassailable. But that decision did not remain intact. The United States Supreme Court reversed the Eighth Circuit decision and held that the FCC does indeed have jurisdiction to adopt pricing rules governing local service interconnection agreements of the type here at issue. *See AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

In its initial brief in this court, submitted prior to the Supreme Court's reversal of the Eighth Circuit's decision, the Florida Commission acknowledged that it would have been bound to follow the FCC regulations and apply the TELRIC methodology "[h]ad the FCC's jurisdiction to set national pricing standards been upheld and its rules not invalidated." (Florida Commis-

sion Brief at 16). Now, the FCC's jurisdiction to set national pricing standards has been definitively upheld by the United States Supreme Court, and the FCC's rules have not been invalidated. The Florida Commission's adoption of TSLRIC in the order under review thus cannot be upheld.

The result is that the Florida Commission must reconsider its order. This is so notwithstanding three grounds now asserted for reaching a different result.

First, the Supreme Court decision in *Iowa Utilities* came down only after the Florida Commission's action. I cannot for that reason, however, decline to follow the Supreme Court decision, or review the Florida Commission's decision without regard thereto. My duty is to resolve this case based on the Telecommunications Act as adopted by the Congress, signed by the President, and interpreted by the Supreme Court. A decision to apply instead the now discredited view of the Eighth Circuit would inappropriately expand the reach of that court's error and in effect divest the FCC of lawful jurisdiction to issue pricing standards applicable to the interconnection agreement at issue. Settled law[9] requires application of the Supreme Court decision to this case.[10]

---

**9.** *See, e.g., Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction"), *quoting with approval Kuhn v. Fairmont Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 54 L.Ed. 228 (1910) ("Judicial decisions have had retrospective operation for near a thousand years") (Holmes, J., dissenting); *see also United States v. Third National Bank,* 390 U.S. 171, 192, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968) (vacating district court judgment based in part on intervening decision and suggesting district court consider reopening record on remand for the taking of additional evidence in light of that intervening decision). The overwhelming majority of courts reviewing arbitration decisions rendered prior to *Iowa Utilities* have agreed. *See, e.g., GTE South, Inc. v. Morrison,* 199 F.3d 733, 740–41 (4th Cir.1999); *AT & T*

*Communications Systems v. Pacific Bell,* 203 F.3d 1183, 1187 (9th Cir.2000); *MCI Telecommunications Corp. v. U.S. West Communications,* 204 F.3d 1262, 1268 (9th Cir.2000).

**10.** The rapidly evolving judicial, administrative and technological developments in the telecommunications field render the task of the Florida Commission (and this court on review) somewhat akin to shooting at a moving target, one whose movements are neither constant nor predictable. That the task is daunting, however, does not mean that the governing principles should be changed. A strength of administrative agencies is, one hopes, their ability to make nice adjustments and deal with evolving circumstances. Nothing in this order should be read to question the authority of the FCC or Florida Commission to adopt appropriate interim or transition measures to the extent consistent with governing law.

Second, it is true, as the Florida Commission and BellSouth note, that in *Iowa Utilities* the Supreme Court addressed only the FCC's jurisdiction to adopt national pricing standards and did not address substantive challenges to the FCC's adoption of TELRIC. Substantive issues remain open on remand to the Eighth Circuit. The Florida Commission and BellSouth suggest I hold any ruling in the case at bar until the Eighth Circuit renders its decision on remand. Substantial time has passed, however, and the Eighth Circuit has not ruled. Moreover, it is clear that, no matter how the Eighth Circuit may ultimately rule, the Supreme Court decision has altered the legal landscape sufficiently to make it appropriate for the Florida Commission to reconsider its decision in light of that decision and any other relevant developments, including any ruling the Eighth Circuit may make. I thus conclude that entry of this order should not be further delayed.

Third, the Florida Commission also seems to assert that it would have made the same decision based on the record before it anyway, even had it applied the FCC's TELRIC regulations. While that seems at least somewhat unlikely, I need not address at this time whether the Florida Commission could make the same substantive decision by applying the correct standards. It is enough for resolution of this case that the Florida Commission has not yet made a decision based on the proper standards and should be given the first opportunity to do so.

In sum, the Florida Commission's decision on pricing is invalid because it is contrary to the Telecommunications Act of 1996 as interpreted by the FCC. The defendant Commissioners will be directed to reconsider the issue.

## II. *DARK FIBER*

■ Dark fiber is fiber optic cable that is in place but not in active use. Without the associated electronic equipment needed at both ends of the cable, the fiber remains "unlit" and inactive. BellSouth likens dark fiber to warehoused inventory: while the fiber optic cable has been laid, BellSouth says it is essentially stored in that location to facilitate later access. Unlike warehoused inventory, however, dark fiber is in place and connected to the network.

The Telecommunications Act requires an incumbent local exchange carrier to provide competitors nondiscriminatory access to "network elements" on an unbundled basis, 47 U.S.C. § 251(c)(3), subject to consideration of whether such access is "necessary" (in the case of proprietary elements) or failure to provide such access would "impair" the competitor's ability to provide service (in the case of non-proprietary elements).

The Florida Commission refused to require BellSouth to provide MCI access to BellSouth's dark fiber on the grounds that, because dark fiber is not "used" in the provision of telecommunications service, dark fiber is not a "network element" as defined in the Act.

The Act defines "network element" as:

... a facility or equipment *used* in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.

47 U.S.C. § 153(29) (emphasis added).

If "used" within this definition means currently in active use, the Florida Commission correctly determined that dark fiber is not a "network element" and that BellSouth therefore need not provide MCI access to BellSouth's dark fiber. But if "used" is broad enough to include fiber that is "used" in the provision of telecommunications service only in the sense that

this is what it is used for when it is used,[11] or broad enough to include fiber that is connected to the network and stands ready for active use if needed, the Florida Commission decision was wrong.

This is, once again, an issue on which the legal landscape has changed substantially since the Florida Commission acted. The FCC, an emerging majority of state commissions, and an apparently unbroken line of federal courts reviewing the decisions of state commissions have concluded that dark fiber *is* a network element.[12] The FCC has analyzed the issue as follows:

> Because dark fiber is already installed and easily called into service, we find that it is similar to the unused capacity of other network elements, such as switches or "dead count" or "vacant" copper wire that is dormant until carriers put it in service.
>
> ... We agree with state commissions and competitive LECs that dark fiber meets the statutory definition of a network element.... Section 153(29) of the Act defines the term "network element" as a "facility or equipment used in the provision of a telecommunications service," including "features, functions, and capabilities that are provided by means of such facility or equipment." The Supreme Court upheld this broad definition of a network element and acknowl-

edged that it includes not only physical elements but non-physical elements as well. Because dark fiber is unused transport capacity, we find that it is "a feature, function, and capability of facilities used to provide telecommunications services." In addition, we note that since the Commission released its Local Competition First Report and Order, several states, acting through arbitration proceedings, have required incumbent LECs to unbundle dark fiber interoffice transport facilities, and several federal district courts, in affirming state commission decisions, have held that dark fiber meets the statutory definition of an unbundled network element.

> ... We reject incumbent LECs' arguments that because dark fiber is transport that is not currently "used" in the provision of a telecommunications service, within the meaning of section 153(29), it does not meet the statutory definition of a network element.... Rather, we agree with the Illinois Commission that the term "used in the provision of telecommunications service" in section 153(29) refers to network facilities or equipment that is "customarily employed for the purpose" of providing a telecommunications service. Although particular dark fiber facilities may not be "lit" they constitute network facilities

---

**11.** In addressing this issue, the Fourth Circuit gave this example of this broader meaning of "used":

> [A]ccording to Webster, a hammer is a "hand tool consisting of a solid head set cross-wise on a handle and *used* for pounding." Webster's Third New International Dictionary 1025 (1981) (emphasis added). We doubt that a hand tool becomes a hammer only when someone starts to pound with it.

*AT & T Communications of Virginia, Inc. v. Bell Atlantic–Virginia, Inc.,* 197 F.3d 663, 672 (4th Cir.1999) (emphasis in original). On this view, fiber does not become "used in the provision of telecommunications service" only when someone starts to communicate with it.

**12.** *See, e.g., MCI Telecommunications Corp. v. U.S. West Communications,* 204 F.3d 1262,

1268 (9th Cir.2000); *AT & T Communications of Virginia, Inc. v. Bell Atlantic–Virginia, Inc.,* 197 F.3d 663, 672 (4th Cir.1999); *U.S. West Communications, Inc. v. Jennings,* 46 F.Supp.2d 1004, 1018–19 (D.Ariz.1999); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.,* 40 F.Supp.2d 416, 425 (E.D.Ky.1999); *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* 15 FCC Rcd. 3696 ¶¶ 325–28 (1999) ("Third Report & Order"). In *Gulf Power Co. v. FCC,* 208 F.3d 1263, 1278 (11th Cir.2000), the Eleventh Circuit said that dark fiber "is bare capacity" and thus does not constitute a "telecommunications service"; this is, however, an analytically distinct issue from whether dark fiber is a "network element."

dedicated for use in the provision of telecommunications service, as contemplated by the Act. Indeed, most other network elements have surplus capacity or can be upgraded to provide additional capacity and therefore are not always "currently used" as the term is interpreted by incumbent LECs. For example, switches, loops, and other network elements each may have spare, unused capacity, yet each meets the definition of a network element.

... We acknowledge that it would be problematic if some facilities that the incumbent LEC customarily uses to provide service were deemed to constitute network elements (e.g., unused copper wire stored in a spool in a warehouse). Defining such facilities as network elements would read the "used in the provision" language of section 153(29) too broadly. Dark fiber, however, is distinguishable from this situation in that it is physically connected to the incumbent's network and is easily called into service. Thus, as indicated above, we conclude that dark fiber falls within the statutory definition of a network element.

*In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* 15 FCC Rcd. 3696 ¶¶ 325–28 (1999) ("Third Report & Order") (footnotes omitted).

Whether this FCC view should be applied in this case presents a different issue from the question addressed above about the applicability of the Supreme Court's *Iowa Utilities* decision. That decision addressed FCC regulations adopted *prior to* the Florida Commission decision under review. The FCC's dark fiber interpretation as quoted above came *after* the Florida Commission's decision. While

judicial interpretations of preexisting statutes or regulations ordinarily apply back to the date of adoption of the statute or regulation at issue, it is less clear that administrative interpretations—which appropriately may have legislative as well as judicial elements—should always do so.[13] But even if not technically applicable, the FCC's analysis has considerable persuasive force, as do the Fourth Circuit's decision in *AT & T Communications of Virginia, Inc. v. Bell Atlantic–Virginia, Inc.,* 197 F.3d 663, 672 (4th Cir.1999), and the Ninth Circuit's decision in *MCI Telecommunications Corp. v. U.S. West Communications,* 204 F.3d 1262, 1268 (9th Cir. 2000), which reached the same result.

I conclude, for the reasons set forth by the FCC and Fourth and Ninth Circuits, that dark fiber is a "network element" within the meaning of the Telecommunications Act.

This does not necessarily mean, however, that the Florida Commission must require BellSouth to provide MCI access to its dark fiber. When the Florida Commission acted, the FCC's Rule 319, 47 C.F.R. § 51.319 (1997), had interpreted the Telecommunications Act's "necessary" and "impair" standards in a manner that posed little obstacle to a competitive carrier seeking access to an incumbent carrier's network elements. In *Iowa Utilities,* however, the Supreme Court invalidated Rule 319, putting teeth back into the "necessary" and "impair" standards. *See AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. at 387–92, 119 S.Ct. 721. The Florida Commission has not had the opportunity to address the application of this decision to MCI's request for access to BellSouth's dark fiber. That issue is not foreclosed by this decision.[14]

---

**13.** *Cf. Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (setting forth and contrasting general principles governing retrospective application of statutes and judicial decisions); *Bradley v. School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (setting forth standards governing issue of whether statute adopted

after district court decision should be applied on review by court of appeals).

**14.** Leaving this issue for resolution by the Florida Commission in the first instance accords with the Fourth Circuit's approach in *AT & T Communications of Virginia, Inc. v.*

## III. COMPENSATION PROVISION

■ As part of its petition for arbitration before the Florida Commission, MCI sought to include in the interconnection agreement specific performance criteria and a compensation mechanism similar to a liquidated damages provision.

The Florida Commission refused to address MCI's requested approach because, it concluded, it lacked authority to do so under either the Telecommunications Act or state law. The Florida Commission determined that the Telecommunications Act authorized arbitration only on "the items enumerated to be arbitrated in Sections 251 and 252 of the Act, and matters necessary to implement those items." (Arbitration Order at 74). The Florida Commission determined that a compensation mechanism was not such an item. The Florida Commission also concluded that it had no authority under state law to mandate a compensation mechanism of the type at issue.

I reject the Florida Commission's narrow reading of the Telecommunications Act's arbitration provisions. The Act imposes various duties on incumbent local exchange carriers and sets forth two methods for determination of the terms and conditions under which any specific incumbent will allow any given competitive carrier to interconnect with the incumbent's facilities and obtain access to its network elements. The first method—the preferred method—is through an agreement voluntarily negotiated between the incumbent and competitive carriers. The second method, applicable only to the extent that voluntary negotiation fails, is through arbitration of "any open issues." 47 U.S.C. § 252(b)(1). The statutory term "any

open issues" makes clear that the right to arbitrate is as broad as the freedom to agree; any issue on which a party unsuccessfully seeks agreement may be submitted to arbitration.

MCI and BellSouth obviously would have been free to enter a voluntary agreement that included a compensation mechanism for breaches of the agreement. Nothing in the Telecommunications Act would have foreclosed any such voluntary agreement. Neither the Florida Commission nor BellSouth apparently contends otherwise. BellSouth chose, however, not to agree voluntarily to any such provision. That was BellSouth's right. When BellSouth determined not to agree, this became an "open issue" that MCI was entitled to submit to arbitration.

When the Florida Commission chose to act as the arbitrator in this matter, its obligation was to resolve "each issue set forth in the petition and the response, if any." 47 U.S.C. § 252(b)(4)(C). MCI's request for a compensation provision was such an issue. This was, therefore, an issue the Florida Commission was obligated to resolve.[15]

This does not mean, of course, that the Florida Commission was obligated to adopt a provision of the type MCI seeks. Had the Florida Commission decided, as a matter of discretion, not to adopt such a provision, MCI would bear a substantial burden in attempting to demonstrate that that determination was contrary to the Telecommunications Act or arbitrary and capricious. But the Florida Commission made no such determination, instead deciding it lacked authority to address the

*Bell Atlantic–Virginia, Inc.,* 197 F.3d 663, 673–74 (4th Cir.1999).

**15.** The Florida Commission makes no assertion it can pick and choose which issues it will arbitrate and which it will not. The Telecommunications Act seems to make this an all or nothing proposition; a state commission can opt to perform the arbitration or can decline to do so, in which event the Act as-

signs the arbitration function to the Federal Communications Commission. The Florida Commission's view was not that it could decline to arbitrate an issue properly presented under the Telecommunications Act, but instead that this was not an issue properly presented under the Act. For the reasons set forth in the text, this view was mistaken.

issue. That was an incorrect interpretation of the Telecommunications Act.

The Florida Commission also asserts that it was precluded by state law from adopting a compensation mechanism of the type sought by MCI, because any such mechanism would require the Florida Commission in effect to make an award of damages, contrary to the principle of *Southern Bell Tel. and Tel. Co. v. Mobile America Corp.*, 291 So.2d 199 (Fla.1974). That is incorrect, for two reasons.

First, any compensation provision in the arbitrated agreement would not necessarily require enforcement by the Florida Commission. A compensation provision could, for example, be self-executing or, to the extent necessary, enforceable in court. Thus, whatever the effect of *Mobile America* on the Florida Commission's ability to enforce a compensation provision, there is assuredly nothing in that decision that precludes the Florida Commission from arbitrating a request for a compensation provision as part of an arbitration proceeding otherwise properly undertaken by the Florida Commission.

Second, if a compensation provision were truly required by the Telecommunications Act and could be adopted in some form without imposing on the Florida Commission an unconstitutional burden, *see Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), then any contrary Florida law obviously would not preclude adoption of such a provision. Under the Supremacy Clause, *see* U.S. Const. Art. VI, the Telecommunications Act, not any contrary Florida provision, is the supreme law of the land.[16]

In sum, when the Florida Commission undertook to arbitrate the dispute between BellSouth and MCI, it became obligated under the Telecommunications Act to arbitrate all "open issues," including MCI's request for a compensation provision. The defendant Commissioners will be directed to arbitrate this issue.

## IV. "RECOMBINING" UNBUNDLED NETWORK ELEMENTS

■ In its counterclaim, BellSouth asserts that the Florida Commission improperly required BellSouth to provide MCI with "recombined" unbundled network elements, thus in effect allowing MCI to purchase complete service from BellSouth not at the wholesale price properly charged in connection with the sale of complete service for resale, but instead at the substantially lower price determined by adding up the prices of the various unbundled network elements that, when combined, constitute complete service. BellSouth asserts this "sham unbundling" violates the Telecommunications Act. In response, the Florida Commission asserts that in the order under review, it did not decide the issues BellSouth now raises.

The dispute over what the Florida Commission did or did not decide is of little consequence. The United States Supreme Court now has definitively resolved this issue against BellSouth. In *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 736–38, 142 L.Ed.2d 835 (1999), the Court upheld the FCC's Rule 315(b), 47 C.F.R. § 51.315(b), by which the FCC adopted the very approach BellSouth now challenges. In reaching this result, the Court rejected the same arguments BellSouth now makes, as advanced in that case by incumbent local exchange carriers challenging Rule 315(b). *See also MCI Telecommunications Corp. v. U.S. West Communications*, 204 F.3d 1262, 1268 (9th Cir. 2000) (holding that Supreme Court's deci-

---

**16.** Nothing in this order should be read as an indication that the Telecommunications Act imposes on state commissions an obligation to perform any enforcement role requested by the parties, or that Congress lawfully could impose any such obligation on state commissions. The holding here is simply that, having undertaken to arbitrate "any open issues" under the Act, the Florida Commission must arbitrate the open issue of whether or not the parties' arbitrated interconnection agreement should or should not include an enforcement or compensation mechanism of the type requested by MCI.

sion in *Iowa Utilities* mandates this result); *U.S. West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1120–21 (9th Cir.1999) (same).

BellSouth is entitled to no relief on its counterclaim.[17]

### *Conclusion*

The Florida Commission acted contrary to the Telecommunications Act of 1996 when it (1) adopted the TSLRIC pricing methodology, (2) concluded that "dark fiber" is not a "network element" within the meaning of the Telecommunications Act of 1996, and (3) decided not to arbitrate the open issue of whether the interconnection agreement between BellSouth and MCI should include a compensation provision. Accordingly,

IT IS ORDERED:

The clerk shall enter judgment stating, "The Florida Public Service Commission's Final Order on Arbitration, as amended, is declared invalid, as set forth in the Order on Merits entered June 6, 2000. Defendants Susan F. Clark, J. Terry Deason, Julia L. Johnson, Diane K. Kiesling and Joe Garcia, in their official capacities as Commissioners of the Florida Public Service Commission, shall conduct further proceedings consistent with the Court's Order on Merits and this judgment." The clerk shall close the file.

---

**17.** The Supreme Court noted that the arguments of the incumbent local exchange carriers in that case might be "academic" in light of the Court's simultaneous invalidation of the FCC's "necessary" and "impair" rule, as discussed above. *See Iowa Utilities*, 525 U.S. at 392, 119 S.Ct. 721. Nothing in this order forecloses the Florida Commission from taking otherwise proper action in response to the Supreme Court's decision on the "necessary" and "impair" rule.