QWEST CORPORATION, Plaintiff,

v.

ARIZONA CORPORATION COMMIS-SION; Marc Spitzer, Mike Gleason, Jeff Hatch–Miller, Fristin Mayes, and William A. Mundell as members of the Arizona Corporation Commission, Defendant.

Mountain Telecommunications Inc., Intervenor.

No. 03–CV–2462PHX.

United States District Court, D. Arizona.

Dec. 20, 2004.

Timothy J. Berg, Esq., Theresa Dwyer, Esq., Fennemore Craig PC, Phoenix, AZ, John M. Devaney, Perkins Coie LLP, Washington, DC, for Plaintiff.

Christopher C. Kempley, Maureen Ann Scott, Arizona Corporation, Phoenix, AZ, for Defendants.

Mitchell F. Brecher, Greenberg Traurig LLP, Washington, DC, Kristine Alynn Kunkel, Greenberg Traurig LLP, Phoenix, AZ, for Intervenor.

## ORDER

MARTONE, District Judge.

The court has before it Qwest Corporation's Opening Brief (doc. 20), Mountain Telecommunications Inc.'s (MTI) Opening Brief (doc. 21), Defendants' Response (doc. 22), and Qwest's Reply (doc. 23). We heard oral argument on Friday, December 3, 2004.

### I. Procedural History

This is an appeal under 47 U.S.C. § 252(e)(6) challenging the Arizona Corporation Commission's (ACC) Decision No. 66385 (*Phase II and IIA Supplemental Opinion and Order*) issued on October 6, 2003, pursuant to the compulsory arbitration provision of the Telecommunications Act of 1996. This court applies a de *novo* standard in considering the ACC's compliance with federal law. *See U.S. West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117 (9th Cir.1999). Any factual findings are reviewed for "substantial evidence." *MCI Telecommunications Corp. v. U.S. West Communications,* 204 F.3d 1262, 1266 (9th Cir.2000). Our role is "to determine whether the agreement...meets the requirements of" sections 251 and 252. 47 U.S.C. § 252(e)(6).

Qwest, an incumbent local exchange carrier (ILEC), is required under the Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq.,* to lease parts of its Arizona telecommunications network, known as unbundled network elements (UNEs), to competitors, called competitive local exchange carriers (CLECs). The UNEs can either be "entrance" facilities or "direct trunk transport" facilities. Entrance facil-

ities are transmission facilities connecting ILEC wire centers to a CLEC's network. The transport facilities transmit calls between ILEC switches or wire centers. The rates for these UNEs set by the ACC and charged by Qwest are at issue here.

The rates for UNEs charged by Qwest were first set as a result of a 1998 arbitration by the Arizona Corporation Commission pursuant to § 252(b) of the Act. Decision No. 60635. MTI was not a party to that decision and did not request arbitration. *Id.* at 3. In December 2000, a Procedural Order was issued by the ACC which stated that Qwest's existing UNE rates would be reviewed in *Phase II* proceedings. *Phase II Opinion and Order* at 4. In the ensuing *Phase II* proceedings, Qwest advocated the adoption of separate rates for entrance and transport facilities. However, in its *Phase II Order*, the ACC adopted the "HAI model" which combined the rates for both facilities. *Phase II Order* at 10–11. The ACC understood this distinction. It noted: "Qwest's models are designed to calculate the investment required to provide a specific element or service," *Phase II Opinion and Order* at 9, while the HAI model focused on "universal service." *Id.*

The parties agree that in June of 2002, Qwest filed with the ACC, and served on all parties to the *Phase II* proceedings, a "compliance filing." Qwest Brief at 10; ACC Answer at ¶ 31. The combined transport rate set in the *Phase II Order* became effective on the date of the *Phase II Order,* June 12, 2002. No party sought judicial review of the *Phase II Order.*

MTI, the intervener here, did not participate in the ACC proceedings until it filed a "Motion for Injunction" with the ACC in January, 2003, seeking to enjoin Qwest from charging the transport rates established by the *Phase II Order. Phase II and IIA Supplemental Opinion and Or-*

*der,* at 2. MTI claimed the transport rates charged as a result of the *Phase II Order* resulted in an unintended five-fold increase in the transport rates previously charged by Qwest and that MTI was being charged for entrance facilities that it did not use. *Phase II and IIA Supplemental Opinion and Order* at 2.

In its *Phase II and IIA Supplemental Opinion and Order* issued October 6, 2003, the ACC stated that all parties, including Qwest, agreed that the *Phase II Order* resulted in an unexpected result and found the *Phase II Order* was based on a "mistaken premise." *Phase II and IIA Supplemental Opinion and Order* at 4. Qwest disputes that it shared the ACC's mistaken assumption. Qwest Brief at 21. The ACC went on to find that "[d]ue to this mistaken assumption, the most equitable interim result for companies such as MTI is to return transport charges to their pre-Phase II status." *Phase II and IIA Supplemental Opinion and Order* at 4–5. These pre-Phase II rates, or "1998 rates," were the rates instituted in 1998 in Decision No. 60635. The ACC determined that the 1998 rates would be effective retroactive to the date of the *Phase II Order* on June 12, 2002 until permanent rates were adopted in *Phase III. Phase II and IIA Supplemental Opinion and Order* at 7. This retroactive application of the 1998 rates is the crux of the dispute before the court. Qwest claims that the ACC's *Phase II and IIA Supplemental Opinion and Order* constitutes unlawful retroactive ratemaking. Moreover, while Qwest does not dispute the power of the ACC to change rates prospectively, it does challenge the ACC's selection of the 1998 rates.

## II. Arbitration under 47 U.S.C. § 252(b)

■ The *Phase II Order* that established the combined entrance and transport rate was the result of binding arbitra-

tion under 47 U.S.C. § 252(b)(1). The Telecommunications Act instructs ILECs and CLECs to negotiate in good faith to reach interconnection agreements. 47 U.S.C. §§ 251(c)(1), 252(a). If ILECs and CLECs are unable to agree, they may resolve their disputes through the compulsory arbitration provision of the Act. § 252(b)(1). If the parties engage in arbitration, the State commission shall "establish any rates for interconnection, services, or network elements according to subsection (d) of this section." § 252(c)(2). Subsection (d) requires that the State commission set a "just and reasonable rate for the interconnection of facilities and equipment" and that such rate be based on cost, be nondiscriminatory, and may include a reasonable profit. § 252(d)(1).

The United States Court of Appeals for the Ninth Circuit addressed the effect of arbitration under § 252(b) in *Pacific Bell v. Pac–West Telecomm, Inc.*, 325 F.3d 1114 (9th Cir.2003). The court concluded that "[o]nce the terms are set, either by agreement or arbitration, and the state commission approves the agreement, it becomes a binding contract." *Id.* at 1120. The arbitration is "binding," *id.*, and the decisions of the ACC, such as the *Phase II Order,* become part of a binding contract. Section 252(a)(1) of the Act supports this conclusion. It makes clear that an interconnection agreement constitutes a "binding agreement." *See* § 252(a)(1); *Pacific Bell,* 325 F.3d at 1127. As a result of the ACC's *Phase II Order,* Qwest was contractually *required* to charge the combined transport and entrance rate prescribed by the HAI model. The *Phase II Order* constitutes a binding contract among Qwest and the CLECs.

MTI and the ACC claim the *Phase II Order* was based on a "mistaken assumption." *Phase II and IIA Supplemental Opinion and Order* at 13. Qwest contends that it did not, as the ACC asserts, share in the "mistaken assumption" that no CLECs used the transport and entrance facilities separately. Qwest's own proposed rate structure advocated separate rates and put the parties on notice that a dispute existed as to whether a combined or separate UNE rate should be charged. Nor is there any evidence in the record to support the ACC's statement in the *Phase II and IIA Supplemental Opinion and Order* that Qwest was unaware that some customers use entrance and transport facilities independently. Thus, it is unlikely that Qwest shared in the "mistaken assumption."

 Although MTI claims it did not know that the combined rate would result in an unexpectedly high charge until it received Qwest's invoice in January, 2003, it should have known. It could have participated in the *Phase II* proceedings in which its interests were at stake. The established principle of contract law that a party who enters a contractual relationship without exercising due diligence cannot complain that the outcome is unexpected applies here. *See* 27 WILLISTON ON CONTRACTS § 70:69 (4th ed.2004). MTI ignored its own limited knowledge of the facts and therefore, bore the risk of its "mistaken assumption." *Id.* Once the time for direct judicial review had passed, the rates in the *Phase II Order* became part of the contract among the parties. A unilateral "error" does not render the contract void ab initio, as the ACC contends.

### III. Retroactive Ratemaking

 Qwest relies on *Arizona Grocery v. Atchison,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), for the proposition that the 1998 rates implemented by the ACC in its *Phase II and IIA Supplemental Opinion and Order* violate the rule against retroactive ratemaking. The ACC explic-

itly adopted the HAI model for UNE rates in its *Phase II Order.*

Qwest points to this language: "When...the Commission declares a specific rate to be the reasonable and lawful rate for the future, it speaks as the Legislature, and its pronouncement has the force of a statute." *Arizona Grocery* at 386, 52 S.Ct. 183. The Ninth Circuit addressed the issue of retroactive changes to interconnection agreements in *Pacific Bell v. Pac–West Telecomm, Inc.,* 325 F.3d 1114 (9th Cir.2003). The court held that a state commission that purports to change the terms of an existing interconnection agreement "contravenes the [Telecommunications] Act's mandate that interconnection agreements have the binding force of law." *Id.* at 1127.

■ MTI and the ACC contend that three exceptions to the general rule against retroactive rate-setting apply here. First, the defendants contend that the general rule does not apply to interim rates. Thus, if the *Phase II* rate had been established as an interim rate, retroactive application of the 1998 rate would not be unlawful. Had the ACC instituted the HAI combined transport rate as an interim rate instead of a permanent rate in the *Phase II Order,* the ACC's actions would not have violated the rule against retroactive ratemaking. Generally speaking, the general rule against retroactivity is inapplicable when there is "adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service." *OXY USA, Inc. v. FERC,* 64 F.3d 679, 699 (D.C.Cir. 1995) *quoting Natural Gas Clearinghouse v. FERC,* 965 F.2d 1066, 1075 (D.C.Cir. 1992). However, it is clear here that the *Phase II* rate was not interim but permanent. At oral argument, the ACC acknowledged that the *Phase II* rates were not expressly interim:

Originally the Commission set rates in the Phase I order that were expressly interim. With regard to the Phase II order, it did not, as Qwest points out, we did not use that language, although the Commission did point out that there was some data that they wanted to consider that was not available in the record at that time. Rep.'s Excerpted Tr. 5–6.

The language in the *Phase II Order* does not designate the rates as interim, but instead explicitly "adopt[s] the HAI model's results for purposes of pricing transport in this proceeding," and notes that the rates should be "re-examined in Phase III so that a full record may be developed." *Phase II Order* at 79. Such a statement does not create an interim rate. If the ACC intended the *Phase II* rates to be interim, its *Phase II Order* certainly did not provide notice to any party, including Qwest. The exception, thus, is inapplicable.

■ Second, the ACC contends that the rule against retroactive ratemaking does not apply where an agency corrects a mistake that is error as a matter of law. However, defendants' reliance on this second exception is misplaced. The exception applies only when on direct judicial review a court holds that an administrative body has erred. For example, in *Mountain States v. Ariz. Corp. Com'n,* 124 Ariz. 433, 604 P.2d 1144, 1147 (1979), the court noted that while an "agency may not later on its own initiative or as the result of a collateral attack make a retroactive determination of a different rate (from the final rate) and require reparations," if a refund is precipitated by a reviewing court's decision, it is lawful. This, of course, is not really retroactive rate-making because the rate set by the commission is not final where judicial review has been invoked. Here, it is clear from the record that the retroactive application of the 1998 rates was initiated and

implemented by the ACC itself long after the time for judicial review had passed. There was no judicial review of the *Phase II Order.* Therefore, this exception does not apply.

Finally, MTI's argument that the ACC is empowered under state law to retroactively amend its order is refuted by the ACC's limited role under federal law: "arbitrating, approving, and enforcing interconnection agreements." *Pacific Bell,* 325 F.3d at 1126. We thus conclude that the ACC may not retroactively change the *Phase II* rates under the Act.

### IV. Port Rates

In a separate proceeding, *Phase IIA,* the ACC addressed another component of the rate structure known as the "switch port." In the *Phase IIA Opinion and Order* of December 12, 2002, Decision No. 65451, the ACC adopted the HAI model for the switch port rates. The ACC now concedes that this rate was a "mistake," Response at 1, but chose not to correct it retroactively.

Qwest argues in the alternative that if the retroactive application of the transport and entrance rates is allowed to stand, the "port rate" should also be corrected retroactively. This contention is mooted by our conclusion that the rate structures arbitrated under § 252(b) are legally binding contracts, and by our conclusion that the ACC may not retroactively alter permanent rates.

### V. Prospective Application of the 1998 Rates

Qwest also asks us to reverse the ACC's order adopting the 1998 rates on a prospective basis until the ACC sets a permanent rate in the *Phase III* proceedings. Qwest claims that the 1998 rates have never been found to comply with the FCC'S TELRIC standards and are inconsistent with other rates set by the ACC in

*Phase II.* However, we need not address these arguments because the ACC's prospective adoption of the 1998 rates is explicitly interim, not permanent. In its *Phase II and IIA Supplemental Opinion and Order,* the ACC "conclude[d] that [the 1998 rates] should be adopted as an interim measure pending ·completion of the Phase III proceeding" and that a "permanent transport rate will be established in Phase III of this docket." *Phase II and IIA Supplemental Opinion and Order* at 5, 13. As we discussed above, the rule against retroactive ratemaking is not violated when rates that are expressly interim are retroactively altered. Therefore, Qwest may challenge the prospective application of the 1998 rates and seek correction in *Phase III* when the ACC sets permanent transport and entrance rates.

### VI. Conclusion

In its *Phase II and IIA Supplemental Opinion and Order,* the ACC concluded that separate transport and entrance rates would be charged retroactively from June 12, 2002, the date of the *Phase II Order,* because the combined rate was "based on a mistaken assumption by all parties." ACC Decision No. 66385 at 13. To the extent that this is a factual finding, there is no substantial evidence to support it. To the extent the ACC believed it could charge the *Phase II* rates retroactively, it erred as a matter of law.

We vacate the *Phase II and IIA Supplemental Opinion and Order* of the ACC (Decision No. 66385) only in so far as it purports to apply the 1998 rates to the period between the *Phase II Order* (June 12, 2002) and the *Phase II and IIA Supplemental Opinion and Order* (October 6, 2003).